[No. C069965. Third Dist. Mar. 17, 2016.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTHONY ARTURO MEDINA et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION†]**

†Under California Rules of Court, rules 8.1105 and 8.1110, only the introductory paragraphs, Facts, part III of the Discussion, and the Disposition are certified for publication.

## COUNSEL

Maribeth Halloran, under appointment by the Court of Appeal, for Defendant and Appellant Anthony Arturo Medina.

Michael Satris, under appointment by the Court of Appeal, for Defendant and Appellant David Valentino Whitehead.

Sharon Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant Brandon Theodore Morton.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine A. Chatman and Angelo S. Edralin, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**DUARTE, J.**—This case returns to us on remand from the California Supreme Court for reconsideration in light of *People v. Banks* (2015) 61 Cal.4th 788 [189 Cal.Rptr.3d 208, 351 P.3d 330] (*Banks*), which articulated the standards to apply in determining whether an accomplice who lacks the intent to kill may qualify as a major participant for purposes of the felony-murder special circumstance. On further consideration, we modify our earlier opinion as hereinafter set forth.

This case arises from two separate incidents. In the first, defendant Anthony Arturo Medina was driving down Florin Road, with defendants Brandon Morton and David Whitehead in the backseat, and fired a gun at a black Lexus, hitting its two occupants. Medina was convicted of two counts of attempted murder and shooting into an occupied vehicle. In the second incident, Morton believed he had been "shorted" several grams of methamphetamine in a drug sale. Morton, with Medina and Whitehead, met with the woman who had made the sale. She was accompanied by her boyfriend, Jason Fletcher, and another man. Morton shot and killed Fletcher. All three defendants were convicted of first degree murder with a robbery special circumstance and attempted robbery. Sentenced to life in prison without the possibility of parole (LWOP), they appeal, raising a myriad of contentions including insufficiency of the evidence, evidentiary errors, and instructional error. In particular, Medina and Whitehead contend insufficient evidence supports the special circumstance. Whitehead also raises procedural errors regarding the denial of his motions to sever and to continue his sentencing, and contends his sentence is cruel and unusual.

We agree with defendants' contentions relating to presentence custody credit and Whitehead's request for correction of his abstract of judgment. We modify the judgments to award presentence custody credit and to correct unauthorized sentences, and order corrections and amendments to the abstracts of judgment. We affirm the judgments as modified.

## FACTS

*May 2, 2008, Shooting*

In May 2008, 15-year-old Brittany S. was living with 19-year-old defendant Medina. In the early morning of May 2, Medina was driving S.'s Impala; S. was in the passenger seat and defendants Morton and Whitehead were in the rear seat, along with S.'s cousin, 15-year-old Waylon R. They had just left a liquor store and were driving down Florin Road. A black Lexus was driving erratically, close to the Impala, and

appeared out of control. The car would speed up to right behind them and then brake. The occupants of the Impala were concerned and frightened.

Medina pulled into a left turn lane and stopped, letting the Lexus pass by. Then, instead of turning, he continued to drive straight, running a red light and following the Lexus. Medina drove up beside the Lexus at a stop light. S. lay down in her seat and Medina reached across her and fired several shots into the Lexus.

Angelo Granados was driving the black Lexus and Miguel Ramos was his passenger. Ramos was shot in the knee, requiring stitches. Granados was shot in the upper thigh. Both were taken to the hospital and were in great pain when first interviewed by the police.

Detective Thomas Higgins interviewed S. about the shooting. She told him that Morton handed Medina the gun used for the shooting, but later said she did not actually see Morton hand over the gun. She told the police Morton had a gun out and had said, "if they pull up beside us, I'll get them."

Detective Higgins also interviewed Armando Mora, who knew Medina, Morton and Whitehead. Mora was on parole in April 2008. He told the police he heard Medina was trying to buy a gun at that time and told him, " 'Hell, no, you can't do that here.' " Medina responded, " 'fool, you know wherever I am I'm strapped' " and pulled out a gun. Mora also told the police that after the shooting, Medina, Whitehead, and "the little white dude" showed up and Medina said they "got into it with some guy on Florin" and Medina "busted on him," meaning he shot at him.

After Medina was arrested he called S. and asked her where the Impala was, telling her the police wanted to know. She told him where it was parked. Detectives subsequently asked her to bring the Impala to them, but it had been stolen the night after Medina's call.

S. claimed she saw Ramos after the shooting and he threatened to kill her.

*May 5, 2008, Killing*

Morton sold drugs for a living. He gave his girlfriend Holly Sarmento $700 to buy a half ounce of methamphetamine for him to resell. She was to get the drugs through her best friend, Jennifer Cauble. On the afternoon of May 4, Sarmento, Cauble, and a man named Tim went together to purchase the methamphetamine. Sarmento claimed Cauble told her that Tim had put some money in for the purchase, so he received a chunk of the methamphetamine,

and she and Cauble smoked $20 worth of the drug in Oak Park. Cauble did not recall either of these events.

Sarmento took the methamphetamine from Cauble to Morton's. That night, he called her and told her the drugs were short. He wanted her to meet with Cauble to settle the matter. Cauble told Sarmento that her boyfriend, Jason Fletcher, would take her to meet with Morton.

After several discussions by telephone, Cauble and Morton decided to meet near a post office. Morton drove with Sarmento to the meeting in her parents' car. Sarmento recalled seeing Whitehead nearby when they left. Fletcher drove Cauble; his "homey" Marty Rainville came too as "muscle." It was around midnight when they met.

Morton got out of the car and spoke with Fletcher; he then got in the backseat of Fletcher's car. Morton had a scale and he gave the methamphetamine to Cauble to weigh. She told him it was short. Cauble noted the drugs appeared to be a different consistency from those she had bought. Morton called Sarmento over and asked if the drugs were the same; she said yes. Cauble told Morton she could "fix it," that is, get his money back.

Morton and Rainville were arguing. Rainville had his hands in his sweatshirt and Morton thought he had a gun. Rainville denied he had anything. Then a car pulled up with Medina and Whitehead inside. Morton got out of Fletcher's car and pulled out a gun. Whitehead pulled a gun on Cauble. Cauble believed all three men had guns, but Sarmento was not sure that Medina did.

Morton ordered everyone out of Fletcher's car. Morton, Medina, and Whitehead walked Fletcher and Rainville across the street at gunpoint. Rainville took off his jacket and hung it on the tailgate of a truck. There was a knife inside.

According to Cauble, when Morton ordered them out of the car, he told Fletcher to leave the car keys. Morton returned to the car, but the steering column had been tampered with and Morton could not start the car. He asked Cauble how to start it, but she would not tell him. Morton was angry and ran to Fletcher. He yelled at Sarmento to get in her parents' car. Whitehead got in to drive and the two drove away. Medina had returned to his car. Morton shot Fletcher twice. Whitehead and Sarmento heard the two shots and Whitehead turned the car around and returned. They encountered Medina and Morton leaving the scene together and turned around again to follow them away. Later, Morton got into the car with Sarmento, and Whitehead joined Medina in the other car.

Cauble and Rainville knocked on doors, trying unsuccessfully to get help for Fletcher. Rainville broke a window in one house. Finally, they took Fletcher to the hospital, where he died of a gunshot wounds to his left shoulder and chest.

### Morton's Letter

In 2009, a deputy sheriff searched Morton's jail cell and found a letter. The letter stated: "This is what I need the witness to say so that I can get unperfect [sic] self-defense which only holds ten years." The letter stated the witness should be female, preferably older. It outlined what the witness should say—that she saw a white guy on a porch shoot—and how she should answer certain questions. The letter included a map of the area of the shooting.

### Medina's Defense

Waylon R. testified that when he saw the Lexus driving erratically on Florin Road, he got down for his safety. He was concerned due to the area and "knowing Sacramento." Before the shooting, the driver's window of the Lexus came down and R. saw a hand reach down low. Someone in that car said, "[i]s that them?"

Medina testified he shot into the Lexus for "[f]ear of my life." When he saw the Lexus coming up fast and swerving, he grabbed his gun and put it in his lap. He felt they "were going to do something." When he pulled up next to the car at the stop light, everyone in his car was down and he heard someone in the other car ask, " '[I]s that him right there?' " He saw the driver put his hands under the seat and come up fast. Medina reached over and fired.

Medina explained he had problems with a gang that claimed the Franklin Boulevard area. He had been a member of the gang, but had left it and now they were trying to kill him. Gang members had called him and threatened him and they had shot at his brother.

On May 4, Medina had weighed the methamphetamine Sarmento brought back from Cauble and told Morton it was five grams short. When Morton left to get his money back, he asked Medina if he wanted to come. Medina drove separately with Whitehead, who had asked if he could go. Medina claimed he did not have a gun. His intention was to make sure Morton got his money back.

When Medina and Whitehead arrived at the meeting, Morton told them to "watch the white boy, I think he's got a gun." Morton told Rainville (who

was White) to take off his jacket. When Whitehead put his gun down and went to the car, Medina got in his own car and started to leave. Morton told him to wait. Medina was turning around when he heard gunshots. He slammed on the brakes because he thought he might get shot; the shots were "real close." Morton jumped in the car with Medina and they drove off. When they stopped to switch cars, Medina was angry with Morton and told him to "[g]et the fuck out of the car."

It was stipulated that when Fletcher's car was impounded, there were 10 grams of methamphetamine and a scale inside.

### Morton's Defense

Cauble had smoked methamphetamine with Fletcher the day of the shooting; they were smoking all the time. Fletcher's blood analysis at his autopsy showed a methamphetamine level of 2.5 milligrams per liter, an extremely high level. Experts testified a therapeutic level is 0.01 to 0.05 milligrams per liter; anything above 0.1 or 0.2 milligrams per liter is considered an abuse level. The recreational use of methamphetamine keeps one awake and very energetic. A user may misperceive his environment and become aggressive, violent, unpredictable, and have delusions and anxiety disorder.

A young girl who lived near the shooting testified she heard glass breaking and people fighting the night of the murder. She heard punching and people saying, "[H]ow do you like that?" She heard glass break and then banging.

Morton testified that on May 2, he was fearful of the Lexus's aggressive driving. He heard someone say, "where's my gun?" or something similar, but denied he handed Medina a gun. He heard someone in the other car say, "is that that nigger right there?" and thought they meant him as he was the only African-American. After the shooting, Medina handed him a gun and Morton put it in the trunk.

When Morton was in the backseat of Fletcher's car on May 5, the first thing he did was hand Fletcher the drugs to weigh. Rainville was fidgeting at his waist and Morton asked if he had a gun. Morton saw a handle of what he thought was a knife. When Cauble claimed it was "different dope," Morton believed she was trying to "pump up" Fletcher and Rainville into believing Morton had switched the dope and was scamming them. Fletcher was high, talking fast and switching subjects. He said he did not "do business with niggers" and "I stay with mine." Cauble had testified Fletcher did not like Black people.

Morton claimed that when he got out of the car and pulled a gun, he was thinking only to get his drugs back. He told Sarmento to "get out of there."

Morton told Cauble to get his drugs and then he put his gun in his sweatshirt. Fletcher grabbed Morton's sweatshirt and they began "tussling." Morton pushed Fletcher off and might have kicked him. Fletcher fell and when he started to get up, Morton saw him reaching for something and shot him. Morton thought Fletcher was grabbing for a gun. After the shooting, he jumped into Medina's car. He threw the gun away the next day.

Morton claimed he wrote the letter about the witness he needed because he was "terrified" after he received Cauble's statement.

*Convictions and Sentencing*

As to the events of May 2, the jury found Medina guilty of two counts of attempted first degree murder (Pen. Code, §§ 664, 187, subd. (a))[1] with enhancements for discharging a firearm and causing great bodily injury (former § 12022.53, subd. (d)), and one count of shooting at an occupied vehicle (§ 246) with the same two firearm enhancements. The jury also found Medina guilty of unlawful possession of a firearm. (Former § 12021, subd. (a).) It had been stipulated that Medina had a felony conviction. As to the events of May 5, the jury found Medina guilty of first degree murder (§ 187, subd. (a)) and found the attempted robbery special circumstance true (§ 190.2, subd. (a)(17)(A)), but found not true the attempted carjacking special circumstance (§ 190.2, subd. (a)(17)(L)) and the personal use of firearm enhancement (§ 12022.53, subd. (b)). It found Medina guilty of attempted robbery (§§ 664, 211), but not guilty of either attempted carjacking (§§ 664, 215), or unlawful possession of a firearm (former § 12021, subd. (a)).

The court sentenced Medina to LWOP on the murder count, and to life plus 25 years to life on each of the two attempted murder counts. Sentence on the other counts was stayed pursuant to section 654.[2] The aggregate sentence was LWOP plus 64 years to life.

The jury acquitted Morton of all counts arising from May 2, except unlawful possession of a firearm. It had been stipulated that Morton had a felony conviction. The jury found Morton guilty of first degree murder with an attempted robbery special circumstance and a personal discharge of a firearm enhancement, attempted robbery, and unlawful possession of a firearm arising from the events of May 5. It acquitted him of the attempted carjacking and the related special circumstance. The trial court found Morton had a strike prior.

---

[1] Further undesignated statutory references are to the Penal Code.

[2] As we explain in the unpublished portion of the opinion, the court failed to impose sentence on certain counts, improperly implementing section 654 by staying imposition rather than execution of sentence.

The court sentenced Morton to LWOP plus 25 years to life on the murder charge, stayed the sentence pursuant to section 654 on the other counts from May 5, and sentenced him to six years (three years doubled) for the May 2 unlawful possession of a firearm. His aggregate prison sentence was LWOP plus 31 years to life.

The jury found Whitehead guilty of first degree murder with an attempted robbery special circumstance and a personal use of a firearm enhancement (former § 12022.53, subd. (b)), and attempted robbery. It acquitted him of the attempted carjacking special circumstance and charge. The court sentenced him to LWOP on the murder count plus 10 years for the enhancement. It stayed the sentence on the attempted robbery.

## DISCUSSION

### I, II*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### III

### *Insufficient Evidence of Special Circumstance for Aiders and Abettors*

Medina and Whitehead contend there is insufficient evidence to support the attempted robbery special circumstance as to them. They contend there is insufficient evidence that they each were a major participant in the attempted robbery or that they acted with reckless indifference to life.

#### A.   *The Law*

██   The special circumstance statute applies not only to actual killers, but also to certain aiders and abettors of first degree murder. (§ 190.2, subds. (c), (d).) An aider and abettor who does not have the intent to kill may still be convicted of special circumstance murder where he "with reckless indifference to human life and as a major participant" aids and abets certain underlying felonies. (§ 190.2, subd. (d).) "The statute thus imposes both a special actus reus requirement, major participation in the crime, and a specific mens rea requirement, reckless indifference to human life." (*Banks, supra*, 61 Cal.4th at p. 798, fn. omitted.)

---

See footnote, *ante*, page 778.

This language in section 190.2, subdivision (d) is taken from *Tison v. Arizona* (1987) 481 U.S. 137, 158 [95 L.Ed.2d 127, 145, 107 S.Ct. 1676] (*Tison*): "[W]e simply hold that major participation in the felony committed, combined with reckless indifference to human life, is sufficient" to satisfy the constitutional culpability requirement for death eligibility. These two requirements—having a reckless disregard for human life and being a major participant—will often overlap. (*Ibid.* & fn. 12 [95 L.Ed.2d at p. 145 & fn. 12].) *Tison* defined "reckless disregard for human life" as "knowingly engaging in criminal activities known to carry a grave risk of death." (*Id.* at p. 157; see also *People v. Estrada* (1995) 11 Cal.4th 568, 577 [46 Cal.Rptr.2d 586, 904 P.2d 1197].)

In *Banks*, the California Supreme Court considered "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant so as to be statutorily eligible for the death penalty." (*Banks, supra*, 61 Cal.4th at p. 794.) Our high court reversed the special circumstance finding against Lovie Troy Matthews, who acted as a getaway driver for an attempted robbery of a medical marijuana dispensary that resulted in the shooting death of the dispensary's security guard. (*Ibid.*) The dispensary had a metal security door providing access from the sidewalk and behind that door sat a security guard who verified patients' identification and physician's medical marijuana recommendations before escorting patients through a second locked door. (*Id.* at p. 795.) The dispensary also had surveillance cameras. (*Ibid.*)

Matthews waited in a car blocks away while his three armed confederates entered the dispensary, gained access past the second locked door, and "began tying up employees and searching the premises." (*Banks, supra*, 61 Cal.4th at p. 795.) Shots were fired and the three men fled. A witness outside the dispensary saw the security guard pushing the front door closed from the outside; one of the robbers reached around from the inside and shot the guard, who fell to the ground. The shooter stepped out of the building and shot the guard again. (*Ibid.*) Matthews picked up two of the three perpetrators in his car. (*Ibid.*) There were a number of telephone calls between Matthews and the shooter before, during, and after the shooting. (*Id.* at pp. 795–796.)

In finding the special circumstance provision did not apply to the evidence presented against Matthews, the court emphasized that "Matthews was absent from the scene, sitting in a car and waiting. There was no evidence he saw or heard the shooting, that he could have seen or heard the shooting, or that he had any immediate role in instigating it or could have prevented it." (*Banks, supra*, 61 Cal.4th at p. 805.)

In reaching its conclusion, our high court considered not only *Tison*, but also *Enmund v. Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct.

3368], a case on which *Tison* builds. (*Banks, supra*, 61 Cal.4th at p. 799.) The *Banks* court described *Enmund* as follows: "In that case, defendant Earl Enmund purchased a calf from victim Thomas Kersey and in the process learned Kersey was in the habit of carrying large sums of cash on his person. A few weeks later, Enmund drove two armed confederates to Kersey's house and waited nearby while they entered. When Kersey's wife appeared with a gun, the confederates shot and killed both Kerseys. Enmund thereafter drove his confederates away from the scene and helped dispose of the murder weapons, which were never found. He was convicted of robbery and first degree murder and sentenced to death. [Citations.]" (*Banks*, at p. 799.)

The *Enmund* court found a broad consensus against imposing the death penalty "where the defendant did not commit the homicide, was not present when the killing took place, and did not participate in a plot or scheme to murder." (*Enmund v. Florida, supra*, 458 U.S. at p. 795 [73 L.Ed.2d at p. 1150].) The court held the Eighth Amendment prohibited the death penalty for one "who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." (*Enmund*, at p. 797 [73 L.Ed.2d at p. 1151].) It reversed the judgment upholding the death penalty for Enmund. (*Id.* at p. 801 [73 L.Ed.2d at p. 1154].)

In *Tison*, the United States Supreme Court revisited the issue of death sentences for accomplices to felony murder, in a case presenting significantly more egregious facts. In *Tison*, Gary Tison's sons Ricky, Raymond, and Donald Tison entered a prison with a large ice chest of weapons and armed their father and his cellmate, both convicted murderers. Brandishing the weapons, the group locked guards and visitors in a closet. During the subsequent escape, their car, already on its spare tire, suffered another flat, so the group agreed to flag down a passing motorist and steal a replacement car. Raymond waved down a family of four (the Lyonses); the others then emerged from hiding and captured the family at gunpoint. Raymond and Donald drove the family into the desert in the Tisons' car with the others following in the Lyonses' car. The Tisons transferred the possessions between the two cars, keeping guns and money from the Lyonses' car. The Lyons family begged for their lives and for water. As Gary's sons were getting water, Gary and his cellmate killed all four Lyons family members with repeated shotgun blasts. When the Tisons were later apprehended at a roadblock, Donald was killed and Gary escaped into the desert, where he died of exposure. Ricky and Raymond Tison and the cellmate were tried and sentenced to death. (*Tison, supra*, 481 U.S. at pp. 139–141 [95 L.Ed.2d at pp. 132–134].)

The *Tison* court distinguished *Enmund*: "Far from merely sitting in a car away from the actual scene of the murders acting as the getaway driver to a

robbery, each petitioner was actively involved in every element of the kidnaping-robbery and was physically present during the entire sequence of criminal activity culminating in the murder of the Lyons family and the subsequent flight." (*Tison, supra,* 481 U.S. at p. 158 [95 L.Ed.2d at p. 144].) The court set forth the rule, codified in section 190.2, subdivision (d): "[M]ajor participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." (*Tison,* at p. 158 [95 L.Ed.2d at p. 144].)

The *Banks* court also considered *Kennedy v. Louisiana* (2008) 554 U.S. 407, 421 [171 L.Ed.2d 525, 128 S.Ct. 2641], "where the court in dicta characterized the governing standard as permitting the death penalty for nonkillers whose 'involvement in the events leading up to the murders was active, recklessly indifferent, and substantial.' " (*Banks, supra,* 61 Cal.4th at p. 800.) The *Banks* court then examined *Enmund* and *Tison* more closely and found: "A sentencing body must examine the defendant's *personal* role in the crimes leading to the victim's death and weigh the defendant's individual responsibility for the loss of life, not just his or her vicarious responsibility for the underlying crime. [Citations.]" (*Banks,* at p. 801.) As to the mental aspect of culpability, "[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Ibid.*)

■ The *Banks* court set forth several factors that distinguish *Enmund* and *Tison,* indicating they may be useful in determining whether a defendant qualifies as a major participant acting with a reckless disregard for human life. "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used? No one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major' [citations]." (*Banks, supra,* 61 Cal.4th at p. 803, fn. omitted.)

■ Although *Tison* and *Edmund* involved the death penalty, *Banks* explained: "[T]he standards we articulate, although developed in death penalty cases, apply equally to cases like this one involving statutory eligibility

under section 190.2(d) for life imprisonment without parole." (*Banks, supra,* 61 Cal.4th at p. 804.) *Banks* made a few points clear. First, where the plan does not include the use of lethal force, "absence from the scene may significantly diminish culpability for death." (*Id.* at p. 803, fn. 5.) Second, knowledge of the possible risk of death inherent in certain felonies—like armed robbery—and knowledge that confederates are armed is insufficient alone to show a reckless indifference to human life. (*Id.* at p. 809.) The court disapproved two appellate court decisions to the extent they held awareness that a robbery accomplice is armed is sufficient alone to show reckless disregard for human life or a subjective awareness of a grave risk of death. (*Id.* at p. 809, fn. 8.)

With the new guidance provided by *Banks*, we consider whether substantial evidence supports the special circumstance as to Medina and Whitehead.

We review a challenge to the sufficiency of the evidence to support a special circumstance finding under the same standard we use to review the sufficiency of the evidence to support a conviction. (*People v. Cole* (2004) 33 Cal.4th 1158, 1229 [17 Cal.Rptr.3d 532, 95 P.3d 811].)

B. *Analysis*

1. *Medina*

Following *Banks*, we conclude there was substantial evidence that Medina both was a major participant and acted with reckless indifference to human life. There was evidence he was involved in setting up the attempted robbery. He alerted Morton to the shortage of the drugs and agreed to accompany Morton to confront the suppliers. While Medina claims the plan was simply to get Morton's money back, it was clear Morton intended to use force, if necessary, and was preparing for an armed confrontation. There was evidence that Medina was armed and suspected the others would be. Medina was also involved in the actual attempted robbery, which did not begin until he and Whitehead arrived. There was evidence Medina, as well as Morton and Whitehead, pulled out a gun and used it—first pointing it at the group and then walking Fletcher and Rainville across the street at gunpoint.[4]

Medina remained at the scene throughout. He waited at Morton's direction and made no attempt to intervene or avert the violence that followed. There was evidence, beyond his mere participation in an attempted armed robbery, that Medina was subjectively aware his participation involved a grave risk of

---

[4] As we explained in the unpublished portion of this opinion, the jury could consider evidence that Medina was armed and used his gun even though the jury acquitted Medina of the personal use of a firearm enhancement.

death. (*Banks, supra,* 61 Cal.4th at pp. 807–808.) The events of May 2 indicated that Morton, as well as Medina, was willing to employ potentially deadly violence. There was evidence that on May 2 Morton handed Medina the gun he fired and that Morton had a gun and threatened "to get them." Medina had known Morton a long time and presumably knew Morton was a drug dealer and a felon. In describing the shooting, Medina told the police, "when the gun comes out, I was like oh, fuck, dude, so I went back to my car," although at trial he denied he knew what was going to happen. The record is unclear exactly how close Medina was to the shooting, but he testified the shots were "real close," so close he thought he might get shot. After the shooting, Medina drove Morton away and made no attempt to aid the victim.

■ Unlike Matthews in *Banks,* Medina was not simply a getaway driver. (*Banks, supra,* 61 Cal.4th at p. 805.) Rather, he was "actively involved in every element of the [attempted robbery] and was physically present during the entire sequence of criminal activity culminating in the murder of [Fletcher] and the subsequent flight." (*Tison, supra,* 481 U.S. at p. 158 [95 L.Ed.2d at p. 144].) There was evidence he played a role both in planning and executing the criminal enterprise, had and used a gun, and his prior experience with Morton gave him an awareness of the danger and risk of death. He helped Morton escape and had no concern for the shooting victim. (See *Banks, supra,* 61 Cal.4th at p. 803.) Substantial evidence supports the special circumstance finding.

### 2. *Whitehead*

Although in some respects the evidence against Whitehead is not as strong as that against Medina, it was sufficient to support the special circumstance finding. Although there was no evidence that Whitehead was involved in *planning* the attempted robbery, when he found out about it he *asked* to go along, and participated fully as armed backup. It was undisputed that Whitehead had and used a gun. When he and Medina arrived at the scene, he was the first out of the car and immediately pulled out his gun. Morton asked him to watch Rainville because Morton suspected Rainville was armed. Whitehead left before the actual shooting, but only because Morton ordered him to take Sarmento away. At the time Whitehead left the scene, Morton was visibly angry at Fletcher and holding him at gunpoint.

The evidence of Medina's reckless indifference to human life applies as well to Whitehead. Like Medina, Whitehead was present on May 2 and knew Morton well. He knew Morton and Medina were not reluctant to shoot and was eager to be a part of their armed confrontation with Fletcher. Although Whitehead was not present at the shooting, unlike Matthews in *Banks,* he

heard it. He then returned to aid Morton and Medina and he left again as soon as he saw they were safe. He made no effort to determine if anyone was injured or to offer aid. (See *People v. Smith* (2005) 135 Cal.App.4th 914, 927–928 [38 Cal.Rptr.3d 1] and cases cited [failure to aid victim or summon help shows reckless indifference to human life].)

Whitehead argues his young age, 18 years 39 days, confirms that he was not subjectively aware his conduct carried a grave risk of death. He relies on the observations in *Miller v. Alabama* (2012) 567 U.S. ___ [183 L.Ed.2d 407, 132 S.Ct. 2455] of the "hallmark features" of youth that reduce the culpability of minors. As we discuss more fully in the unpublished portion of the opinion, Whitehead was not a minor so *Miller* does not apply to him. Further, Whitehead points to no evidence showing that his youth, or other personal characteristics, diminished his ability to appreciate the danger created by his conduct in eagerly joining Morton and Medina as armed backup in their ill-fated attempt to remedy an illegal drug deal gone bad.

IV–XII*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgments are modified to award all three defendants custody credit (§ 2900.5) and to impose and stay defendants' sentences (§ 654) on counts 2, 4, and 8 as set forth in the unpublished portion of this opinion. The trial court is directed to amend and correct the abstracts of judgment in accordance with this opinion and to forward certified copies thereof to the Department of Corrections and Rehabilitation. As modified, the judgments are affirmed.

Raye, P. J., and Blease, J., concurred.

A petition for a rehearing was denied April 14, 2016, and the petitions of all appellants for review by the Supreme Court were denied June 29, 2016, S234118. Corrigan, J., did not participate therein.

---

*See footnote, *ante,* page 778.