Filed 9/8/22  P. v. Vinck CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ROBERT VINCK,<br><br>    Defendant and Appellant. | D079239<br><br><br><br>(Super. Ct. No. CR70016 ) |

APPEAL from an order of the Superior Court of San Diego County, Albert T. Harutunian III, Judge.  Affirmed.

Alex Coolman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Alan L. Amann and Kristen Kinnaird Chenelia, Deputy Attorneys General, for Plaintiff and Respondent.

## I.

## INTRODUCTION

Robert Vinck appeals an order denying his Penal Code section 1172.6 resentencing petition after an evidentiary hearing.[1]

In 1984, Vinck pleaded guilty to second degree murder in exchange for the dismissal of the other counts against him. In 2019, Vinck filed a petition for a writ of habeas corpus, which the trial court construed as a section 1172.6 resentencing petition. Section 1172.6 altered liability for those convicted of felony murder and murder under the natural and probable consequences doctrine and provided such defendants a means to petition the court for resentencing.

The trial court denied Vinck's resentencing petition after finding beyond a reasonable doubt that: (1) Vinck was, at a minimum, a major participant in the underlying felony and acted with reckless indifference to human life, and (2) in addition or alternatively, Vinck had the intent to kill and aided and abetted the actual killer in carrying out the murder.

On appeal, Vinck concedes that he was a "major participant" in the crime but contends that, given his youth and intellectual disability, there was insufficient evidence that he acted with the requisite reckless indifference to human life. Vinck alternatively contends that the case should be remanded for the trial court to consider Vinck's youth and intellectual disability in its analysis of the reckless indifference element.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated. Vinck brought his petition under former Penal Code section 1170.95, which was renumbered as Penal Code section 1172.6 without substantive change on June 30, 2022. (See Stats. 2022, ch. 58, § 10.) As such, we refer to the subject statute by its current number throughout this opinion.

The People contend that the trial court was not required to consider either Vinck's youth or intellectual disability and that substantial evidence supports the court's ruling. The People further contend that regardless, the court is presumed to have considered all relevant factors and that there is substantial evidence to support the trial court's additional finding that Vinck had the intent to kill under a direct aiding-and-abetting theory. Because we agree with the People that the trial court is presumed to have considered all relevant factors before it and that there is substantial evidence to support its findings, we affirm.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The preliminary hearing, Vinck's guilty plea deal, and the section 1172.6 petition*

In 1984, Vinck was charged with the murder of J. Turner (§ 187), robbery (§ 211), burglary (§ 459), kidnapping (§ 207, subd. (a)), receiving stolen property (§ 496.1), and taking a vehicle without consent (Veh. Code, § 10851).

At the preliminary hearing, defense counsel asked the magistrate whether Vinck was being bound over on a theory of felony murder or on the theory of being a principal. The magistrate responded that he had "no express evidence of premeditation" and "no evidence before me that [Vinck] intended to murder somebody when he went to the residence." The magistrate clarified, however, that he was "not making a finding that [the] People would be bound at the time the information is filed with other information to be presented to a trial court."

3

Vinck later pleaded guilty to second degree murder in exchange for dismissal of the other counts against him. The court sentenced Vinck to 15 years to life in prison.

In 2019, Vinck filed a petition for habeas corpus. The trial court construed it as a petition for resentencing under section 1172.6 and appointed counsel for Vinck. After briefing from the parties, the trial court found that Vinck had made a prima facie case for relief and issued an order to show cause why the relief requested should not be granted. The court then set an evidentiary hearing on the petition.

B. *Evidence presented at the section 1172.6 evidentiary hearing*

At the evidentiary hearing, Vinck's codefendant, L. Schwartz, testified that, in 1984, he and Vinck were casual friends and would sometimes smoke marijuana and commit crimes together. Schwartz was 20 years old and 6 feet 6 inches tall, and Vinck was 18 years old and 5 feet 8 or 9 inches tall.

While a minor, Vinck performed sexual acts for Turner, whom Schwartz had not met. Vinck told Schwartz that on one occasion before the murder, Turner and two other men raped Vinck. Vinck described this experience as " 'traumatic.' "

A few days before Turner's murder, Vinck told Schwartz that they should rob Turner and that Schwartz should kill Turner because Turner had refused to pay Vinck for sexual acts. Schwartz said that he was easily manipulated, and that Vinck had told him that he would get extra money out of the crime to buy drugs. Schwartz said that he initially refused to participate in the murder but ultimately, "[i]t was pretty much set that I was going [to] kill [Turner] and I had to find a way to do it."

Vinck denied ever asking Schwartz to kill Turner. Some evidence, however, suggested that Vinck knew of Schwartz's propensity for violence.

4

Vinck testified that Schwartz had threatened to kill Vinck in the past. Schwartz also admitted that, in the five or six years prior to the crime, he had been wanting to kill someone. In addition, before the murder, Schwartz had been in a psychiatric hospital for setting a building on fire. Both he and Vinck had criminal histories.

On the night of the murder, Vinck and Schwartz took a bus to Turner's house. Turner let them in and offered them beer. A minor boy was also present at Turner's home. After drinking the beer, Schwartz went into the kitchen, came back with a pointed carving fork, and held it to Turner's throat. He told Turner that this was a robbery and that if there were any trouble, he would kill Turner.

Schwartz and Vinck tied up Turner with extension cords. Vinck tied up and handcuffed the minor in another room. Vinck said that, before the crime, Schwartz had wiped off fingerprints from a set of handcuffs and told Vinck to bring them to Turner's house, which he did. To avoid fingerprints, Schwartz wore gloves, and Vinck wore socks on his hands.

Schwartz testified that, while Turner was tied up on the floor, Schwartz "had [Vinck] turn [Turner's] head at an angle." Schwartz then stomped on Turner's head several times, killing him.

The minor did not see either man strike Turner but said that during the encounter, Vinck left the room where the minor was tied up for about ten minutes.

Vinck denied participating in the actual killing.[2] He also claimed that he did not know that Schwartz was going to kill Turner until that night. He

---

[2] As noted by the trial court, Vinck made a number of contradictory denials and admissions to law enforcement officers during the investigation of Turner's murder. Vinck initially denied *any* involvement in the murder and claimed that he had not seen Turner for two weeks.

heard Schwartz say, "I'm going to kill you. I don't care. I'm a crazy motherfucker." Vinck claimed that he said, "[S]top with the killing shit, man, because we don't need that" but maintained that he could not have stopped Schwartz because of Schwartz's size. Vinck further claimed that he did not witness Schwartz beat Turner to death. Vinck said that he did not want any part of the situation and that he had walked outside to the alley for five or ten minutes. Although Vinck denied that he had previously asked Schwartz to kill Turner or that they had "planned" in advance to rob him, he admitted that when Schwartz said "it's time," he knew that Schwartz meant that it was time "to rob."

After Schwartz killed Turner, he and Vinck ransacked Turner's home and stole his watch, radio, TV, money, and bank cards. At some point, they untied the minor. Schwartz and Vinck then drove away in Turner's car and dropped off the minor in the street. Vinck and Turner split the money they had stolen, ate a meal at a restaurant, and drove the car to Mexico, where they dumped it before walking back across the border.

Several days later, officers found Turner dead in his home. Turner had died of head injuries three to five days earlier. A pathologist opined that Turner could have been hit in the head with one blow but more likely had been hit at least two or three times.

On his application for probation, Vinck wrote, " 'I did it because he raped me and I lost my mind for that reason and I did not have control over it but then after I did it I felt very very sorry what we did and very stupid about it . . . .' " Vinck's probation report noted that Vinck read at a second grade level, had an IQ of 72, was dyslexic, and was "intellectually limited" and "remarkably immature."

C. *Trial court's order denying resentencing*

Following the evidentiary hearing, the trial court issued a detailed written order denying Vinck's petition for resentencing. The court began its order by noting that the magistrate's conclusions at the preliminary hearing were not binding on the trial court because they were based on a different record.

The trial court evaluated the evidence in detail. The court found that "[t]here [wa]s no doubt that if Schwartz's version of events is accurate, that Petitioner is guilty." In making this finding, the court repeated Schwartz's testimony that he and Vinck had planned to kill Turner before they went to Turner's home, as well as his testimony that Vinck had tied up Turner and held him down while Schwartz stomped on Turner's head to kill him.

The court considered evidence casting doubt on Schwartz's testimony, including Vinck's denials of various events. However, the court found Schwartz's testimony to be credible in part because Schwartz had freely admitted that he personally killed Turner; testifying to Vinck's complicity did not lessen Schwartz's own liability for the murder; and over the last 37 years, Schwartz had consistently refrained from trying to shift sole responsibility for Turner's death onto Vinck. The court also considered several of Vinck's admissions, including his probation interview admission that " 'I did it because he raped me and I lost my mind for that reason . . . .' " The court found that this admission "refers to killing Turner, not stealing a few minor items."

In its order denying Vinck's petition for resentencing, the court stated that it had considered the evidence under *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), and that the court was convinced beyond a reasonable doubt that Vinck "was, at a

7

minimum, a major participant in the underlying felony and acted with reckless indifference to human life.  In addition, and alternatively, the evidence proves beyond a reasonable doubt that [Vinck] had the intent to kill, and aided, abetted, induced, solicited and assisted the actual killer in the commission of murder in the first degree."

## III.

## DISCUSSION

A. *Relevant legal standards*

1. <u>Senate Bill 1437 and Penal Code section 1172.6</u>

In 2018, the Legislature enacted Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill No. 1437), which abolished the natural and probable consequences doctrine in cases of murder, and limited the application of the felony murder doctrine.  Under section 189, subdivision (e), as amended by Senate Bill No. 1437, a defendant is guilty of felony murder only if he, himself, killed the victim; directly aided and abetted or solicited the killing, or otherwise acted with the intent to kill; or "was a major participant in the underlying felony and acted with reckless indifference to human life."  (§ 189, subd. (e)(3); *People v. Lamoureux* (2019) 42 Cal.App.5th 241, 247-248.)

Senate Bill No. 1437 also added a new section, section 1172.6, which created a procedure to seek retroactive relief for those who have been previously convicted of murder under one of the now-barred theories.  (Stats. 2018, ch. 1015, § 4; *People v. Lewis* (2021) 11 Cal.5th 952, 957.)  If the petitioner files a facially adequate petition, he is entitled to the appointment of counsel and a response from the prosecution.  (§ 1172.6, subds. (b)(1), (c); *Lewis, supra*, at p. 970.)  The trial court then holds a hearing to determine whether the petitioner has made a prima facie case for relief.  (§ 1172.6,

8

subd. (c).) If so, the court must issue an order to show cause why relief should not be granted. (*Ibid.*; *Lewis, supra*, at p. 971.)

At the hearing on the order to show cause, the prosecution must prove beyond a reasonable doubt that the petitioner is guilty of murder, attempted murder, or manslaughter under amended sections 188 and 189. (§ 1172.6, subd. (d)(3).) Both the prosecution and the petitioner are permitted to "offer new or additional evidence." (*Ibid.*) The trial court acts as an independent factfinder and determines whether the prosecution has met its burden. (*People v. Ramirez* (2021) 71 Cal.App.5th 970, 984.)

2. *Banks* and *Clark* factors

In *People v. Banks, supra*, 61 Cal.4th at p. 803 (*Banks*), our Supreme Court identified factors relevant to determining whether a defendant qualified as a "major participant" in a felony: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Ibid.*) Importantly, "[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Ibid.*) Rather, "[a]ll may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' (*Tison v. Arizona* [(1987)] 481 U.S. [137,] 157) was sufficiently significant to be considered 'major.' " (*Ibid.*)

9

In *Clark, supra*, 63 Cal.4th 522, our Supreme Court identified a similar nonexclusive list of factors relevant to determining whether a defendant acted with "reckless indifference to human life": (1) the defendant's knowledge of weapons used in the crime; (2) how those weapons were used; (3) the number of weapons used; (4) the defendant's physical proximity to the crime; (5) the defendant's opportunity to stop the killing or aid the victim; (6) the duration of the crime; (7) the defendant's knowledge of the killer's propensity to kill; and (8) the defendant's efforts, if any, to minimize the risk of violence during the crime. (*Id.* at pp. 618-622.) As with the major participant factors, no one factor is entirely dispositive. (*Id.* at p. 618.)

Further, although major participation is not enough on its own to establish reckless indifference, major participation can "often provide significant support for such a finding." (*Tison, supra*, 481 U.S. at p. 158, fn. 12; accord, *Clark, supra*, 63 Cal.4th at pp. 614-615 [noting the "interrelationship" between the two *Tison* elements and that they often overlap]; *People v. Medina* (2016) 245 Cal.App.4th 778, 788 [noting that "[t]hese two requirements—having a reckless disregard for human life and being a major participant—will often overlap"].)

3. <u>Standard of review</u>

We review a trial court's factual findings at a section 1172.6 evidentiary hearing for substantial evidence. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.) Thus, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence." (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).) "[S]ubstantial evidence" is "evidence that is reasonable, credible, and of solid value" from which a reasonable trier of fact could find beyond a reasonable doubt that the defendant was a major participant and acted with reckless

10

indifference to human life or, alternatively, that he acted with the intent to kill in aiding and abetting the murder. (*Ibid.*) Accordingly, "[w]e presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence." (*Ibid.*)

B. *Substantial evidence supports the trial court's finding that Vinck was ineligible for relief under section 1172.6*

Vinck contends that, given his youth and intellectual disability at the time of the killing, the evidence was insufficient to support the trial court's finding that he acted with reckless indifference to human life. We are not persuaded. Even assuming that the trial court was required to consider Vinck's youth and intellectual disability, we presume that it did so because the parties presented evidence to the court regarding these factors at the evidentiary hearing. We further conclude that substantial evidence supports the trial court's finding that Vinck acted with reckless indifference to human life and, alternatively, that he had the intent to kill and aided and abetted the actual killer in carrying out the murder. Therefore, we affirm.

1. *Even assuming that the trial court was required to consider Vinck's youth and intellectual disability, we presume the court did so*

On appeal, "[t]he court is presumed to have considered all of the relevant factors in the absence of an affirmative record to the contrary." (*People v. Myers* (1999) 69 Cal.App.4th 305, 310; *People v. Brugman* (2021) 62 Cal.App.5th 608, 637.) It is undisputed that evidence of Vinck's age and intellectual disability was before the trial court at the evidentiary hearing. Moreover, the trial court's written opinion reflects a detailed evaluation of the evidence before it. There is no affirmative record to the contrary.

Vinck contends that the trial court's silence as to Vinck's youth and intellectual disability constitutes "an affirmative record to the contrary" such

11

that the presumption does not apply. We disagree. The trial court did not state that it had *not* considered Vinck's youth or intellectual disability. Nor is there any requirement that the trial court state on the record every factor and item of evidence that it considered. Thus, we presume that the court considered Vinck's youth and intellectual disability in its *Banks/Clark* analysis, to the extent that it was required to do so.

2. *Substantial evidence supports the trial court's finding that Vinck acted with reckless indifference to human life, as well as its finding that Vinck had the intent to kill under a direct aiding-and-abetting theory*

There is substantial evidence in the record to support a finding of the "subjective and objective elements" of the reckless indifference to human life mens rea.[3] (*Clark, supra*, 63 Cal.4th at p. 617.) Specifically, it is reasonable to infer that Vinck "conscious[ly] disregard[ed]" the grave risks of death known to him, based on the evidence that: Vinck asked Schwartz to rob and kill Turner; Vinck knew of Schwartz's propensity for violence (as further evidenced by his own expressed fear in the past that Schwartz would kill him); Vinck heard Schwartz tell Turner, "I'm going to kill you. I don't care. I'm a crazy motherfucker," and Vinck believed him; Vinck helped restrain and tie up Turner; and Vinck held Turner's head at an angle while Schwartz repeatedly stomped on it to kill Turner. (*Clark,* supra, 63 Cal.4th at p. 617 [subjective element].) We conclude that this evidence also supports the trial court's finding that " '[t]he risk [of death] [was] of such a nature and degree that, considering the nature and purpose of [defendant's] conduct and the

---

[3] Vinck concedes that he was a "major participant" in the crime. Thus, this finding is established and we need not review it. Vinck contends only that, given his youth and intellectual disability, the prosecution did not present sufficient evidence to prove beyond a reasonable doubt that he acted with reckless indifference to human life.

circumstances known to him, its disregard involve[d] a gross deviation from the standard of conduct that a law-abiding person would observe in [defendant's] situation.' " (*Ibid.* [objective element].)

Vinck nevertheless contends that this court must re-weigh the evidence "with an eye toward the reality" that those with intellectual disabilities are more likely to make inculpatory statements to law enforcement. Vinck further complains that there were "evidentiary ambiguities" in this case, including the magistrate's finding at the preliminary hearing that there was no evidence of Vinck's intent to murder. But it is not the role of this court to reweigh evidence or reevaluate a witness's credibility. (*Albillar, supra*, 51 Cal.4th at p. 60 ["If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility' "].) Indeed, the trial court's order reflects that it carefully considered and weighed the evidence. The trial court relied in part on Schwartz's testimony, which the trial court found to be credible. It did so, however, only after weighing Schwartz's credibility, including by considering evidence that cast doubt on Schwartz's testimony, such as Vinck's own admissions and contradictory statements. The magistrate's contrary finding, which the trial court noted was based on a different record, also does not impact our conclusion. Moreover, the magistrate, himself, noted that this finding was based on the evidence at the preliminary hearing and was not binding on the People. Vinck offers no binding authority to the contrary.

Further, much of this same evidence—that Vinck asked his friend, Schwartz, to kill Turner and then helped Schwartz commit the robbery and murder, including by holding Turner's head while Schwartz stomped on it—is

also substantial evidence supporting the trial court's additional finding that Vinck was guilty under a direct aiding-and-abetting theory. (See *In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094-1095 (*In re Lynette*) [discussing factors that may be considered in determining whether a defendant directly aided and abetted a crime as "presence at the scene of the crime, companionship, and conduct before and after the offense"]).

Vinck argues that, to be liable under this theory, there must be evidence of more than his "mere presence" at the scene of the crime. (*People v. Boyd* (1990) 222 Cal.App.3d 541, 556-557.) We conclude that Vinck's solicitation of Schwartz to murder Turner, his physically assisting in the commission of the murder, and his friendship with Schwartz (a "casual friend" with whom Vinck sometimes smoked marijuana and committed other crimes, and with whom he fled to Mexico after the murder to dump Turner's car) are more than sufficient to support the trial court's findings. (See, e.g., *In re Juan G.* (2003) 112 Cal.App.4th 1, 5 [reasonable to infer defendant aided, promoted, and encouraged robbery based on his prior companionship with codefendant, his accompanying the codefendant immediately before the robbery and during the attempted escape after, his presence at crime scene, his proximity to victim, and his flight from the scene]; *In re Lynette, supra,* 54 Cal.App.3d at p. 1095 [reasonable to infer aiding and abetting where defendant was at the crime scene, fled with the perpetrator and her companions, and was later detained with her companions]).

For these reasons, we conclude that the record contains "evidence that is reasonable, credible, and of solid value" from which the trial court could find beyond a reasonable doubt that Vinck acted with reckless indifference to human life and, in the alternative, that he acted with the intent to kill in

14

aiding and abetting Schwartz in the murder.  (*Albillar, supra*, 51 Cal.4th at p. 60.)

## IV.
## DISPOSITION

The order is affirmed.


AARON, J.

WE CONCUR:

HALLER, Acting P. J.

DATO, J.