Filed 4/9/21  P. v. White CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LAVELL CALVIN WHITE and ALI ABDUL MOHAMMED,<br><br>    Defendants and Appellants. | 2d Crim. No. B293313<br>(Super. Ct. No. 1455141)<br>(Santa Barbara County) |

The key phrase in this appeal is "reckless indifference to human life."  As we shall explain, this is an appropriate description of appellant Lavell White's mental state during the attempted robbery and shooting death of Terrence Richardson.

Lavell Calvin White and Ali Abdul Mohammed appeal from the judgment after a jury convicted them of first degree murder (count 1) and found true the special circumstance that they committed the murder while engaged in an attempted

robbery.  (Pen. Code, §§ 187, subd. (a); 190.2, subd. (a)(17).)[1]  The jury found not true the allegation that Mohammed intentionally and personally discharged a firearm in the commission of the murder.  (§ 12022.53, subd. (d).)  The trial court sentenced White and Mohammed to prison for life without parole (LWOP) and imposed various fines and assessments.[2]

The prosecution proceeded solely on the theory of felony murder.  White contends the evidence was insufficient to establish he acted with the "reckless indifference to human life" required for special circumstances felony murder.  Mohammed contends (1) the evidence was insufficient to establish his identity as the killer, and (2) the trial court erroneously instructed the jury regarding common scheme or plan.  Both appellants contend the trial court erroneously instructed the jury regarding accomplice testimony, the prosecutor committed misconduct by vouching for the credibility of her charging decisions, their LWOP sentences constitute cruel and unusual punishment, and the

---

[1] All statutory references are to the Penal Code unless otherwise stated.

[2] White and Mohammed were also jointly charged with several robberies and burglaries occurring in the weeks before the murder.  The jury hung on one count of second degree robbery with an allegation that Mohammed personally used a firearm (§§ 211, 12022.53, subd. (b); count 2), and found appellants not guilty of another count of robbery (count 3).  The jury hung on three counts of first degree burglary (§ 459; counts 4, 6 and 7), and found appellants not guilty of another count of first degree burglary (count 5).  The trial court dismissed the hung counts on motion of the prosecution.

court erred in failing to consider their ability to pay fines and assessments.  We affirm.

FACTS

White and Mohammed were teammates on a basketball team at Allen Hancock College ("AHC") in Santa Maria.  White and Mohammed sometimes stayed at A.B.'s apartment on Bradley Road in Santa Maria (the Bradley apartment).[3]  Starting in September 2014, White, Mohammed, and their friend G.O. discussed committing burglaries and robberies to make money.

Around Thanksgiving 2014, G.O. saw Mohammed with a black and silver handgun.  J.A. saw White with it before the shooting and believed it was a nine-millimeter gun.  The gun was usually kept near White's bed in a room he shared with Mohammed.  White, Mohammed, and G.O. all hid the gun at different times in a hole in the ceiling of a garage.  White told two people that he, Mohammed, and G.O. took the gun while committing an apartment burglary at the Montiavo apartments in Santa Maria where G.O. lived with other AHC football players.

On November 28, 2014, Brandon B. was notified that his Montiavo Apartment had been burglarized.  He found various items missing, including his registered 9 mm firearm with a magazine containing 10 rounds of Hornady critical defense ammunition.  He identified a photo exhibit at trial that looked

---

[3] First and last initials are used to protect the identities of uncharged participants.

the same as his gun model, bearing serial number HE4135.[4]

Around Christmas 2014, White, Mohammed, and G.O. agreed on a plan to rob a marijuana dealer, R.D. The plan was as follows: They arranged to purchase marijuana from R.D. at their apartment building. When R.D. arrived in his car with the marijuana, Mohammed would enter the car with a handgun and remove the keys from the ignition "so the dude can't peel off." White would stand outside the driver's side window and display a replica AK-47 assault rifle. Mohammed would take whatever property was available and then exit the car.

White and Mohammed had successfully followed the identical plan in two robberies of other marijuana dealers in Santa Maria. On both of these occasions, the marijuana dealer was alone in his car at the time of the robbery. After the second robbery, they characterized Santa Maria marijuana dealers as "just sweet, soft," and "easy to take advantage of."

White obtained R.D.'s cell phone number. On December 28, 2014, White texted R.D. to arrange a marijuana purchase. On December 30, 2014, G.O. called R.D. and they agreed to meet to complete the purchase. Shortly before midnight, R.D. arrived and parked across the street from the Bradley apartment building. Unexpectedly, R.D. brought a man with him, Richardson, who was in the front passenger seat. Appellants went upstairs, put on their hoodies, got the loaded 9 mm pistol and the replica AK-47 BB gun, and went outside. G.O. went outside to get a better view.

Mohammed got into R.D.'s car by entering the rear

---

[4] The gun was recovered in November of 2015, almost a year after the shooting in this case, in an unrelated investigation in Bakersfield.

passenger's side door, and moved to the middle of the back seat. R.D. showed him the marijuana. Mohammed "reach[ed] over," leading R.D. to believe that "he was grabbing to get the marijuana." Instead, Mohammed took the car keys from the ignition, placed them in the center console, pulled out a gun, and told R.D. "to give him everything in the car." Richardson, R.D.'s passenger, took no action in response to Mohammed's demand.

R.D. "felt something touch the side of [his] head." He looked to his left and saw White outside the driver's side window holding what appeared to be an assault rifle. The window was open. From a distance, G.O. saw White standing by the driver's window with the replica AK-47 pointed at the driver.

Panicked, R.D. grabbed his keys from the center console, started the engine, and drove away, almost hitting White. As R.D. "started to drive away," Richardson turned around, "swinging on the guy with the gun," punching Mohammed. R.D. also tried to punch Mohammed with his right hand as he drove, and told him to get out of the car. G.O. saw Mohammed and the passenger "wrestling" in the car.

R.D. heard a gunshot. Mohammed told him "to pull over." R.D. pulled over and Mohammed got out of the car without taking any property from the car. G.O. saw the car stop a very short distance from where R.D. had originally parked. G.O. heard what he thought were multiple gunshots, saw a flash, and saw Mohammed jump out of the car and run back to White with the 9 mm pistol in his hand.

Richardson told R.D. that he had been shot. R.D. drove Richardson directly to the hospital. Richardson died a short time later from a single gunshot wound to his abdomen that pierced an artery causing fatal blood loss. A firearms examiner

concluded the bullet recovered from Richardson's body was fired from a nine-millimeter gun. A shell casing was located in R.D.'s car on the right rear passenger window switch. The casing was a Hornady critical defense round, the same brand of ammunition stolen with the gun during the burglary of Brandon B.'s Montiavo apartment.

After the shooting, Mohammed told G.O. that he shot someone. Mohammed said he "had no choice, he had to" fire the handgun. White and Mohammed changed clothes. White called K.M. and said "[s]omething went down" and he needed a ride. White sounded "frantic" and said it was "an emergency." K.M. drove White, Mohammed, and G.O. to a friend's apartment. In the car, White told G.O. he needed to change his cell phone number because his phone was used to contact R.D. White then texted A.B., stating, "Dawg, if anybody come to the house look for us, we haven't been there all day, and I'm talking about the police."

Later that night, White called M.T. and tried to sell the stolen 9 mm handgun. G.O. told J.A. that "somebody got shot." J.A. took a picture of White holding the gun while wearing a glove. White and Mohammed then went to another apartment to smoke marijuana. The following night, White, Mohammed and others shot the gun to celebrate New Year's Eve.

R.D. was shown a photographic lineup and said the photograph of Mohammed "kind of looked like the male who was in the back seat of the vehicle." R.D. said it was hard to see in the dark. He said he "[v]aguely" saw his face, and estimated the man's height as "[m]aybe 5'8" to 5'10"." (A basketball teammate estimated Mohammed's height as 6'6".) R.D. said the shooter was African American, "had like a little, slender face" and was

6

"skinny." He identified Mohammed in a second photographic lineup, and said, "Looks a lot like him."

Nine days after the shooting, White exchanged texts with another student to plan another robbery. The other student asked if White could get "bangers" (firearms). White's response was to inquire how much would he be paid and stated he had a gun.

Police executed a search warrant at the Bradley apartment and found the replica AK-47 BB gun.

DISCUSSION

*Standard of Review*

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27 (*Lindberg*).) We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.) We presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence, whether direct or circumstantial. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)

The reviewing court does not sit as the trier of fact, does not reweigh the evidence, or determine witness credibility, or ask whether the evidence might have supported a different verdict. (*Lindberg*, *supra*, 45 Cal.4th at p. 27; see also *People v.*

7

*Manibusan* (2013) 58 Cal.4th 40, 87 (*Manibusan*).)  The reviewing court draws inferences in favor of the judgment. (*People v. Superior Court* (*Ramos*) (1991) 235 Cal.App.3d 1261, 1266, fn. 2.)

The same standard of review applies to the sufficiency of the evidence supporting special circumstance findings.  (*People v. Chatman* (2006) 38 Cal.4th 344, 389; *People v. Medina* (2016) 245 Cal.App.4th 778, 791 (*Medina*).)

*The Special Circumstance Finding*

White contends the evidence is insufficient to establish that he acted with reckless indifference to human life, a necessary element for special circumstances felony murder where the defendant is not the shooter.

A defendant convicted of murder shall be sentenced to death or LWOP if "[t]he murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of . . . [r]obbery."  (§190.2, subd. (a)(17)(A).)[5]  A defendant who is "not the actual killer" must act "with reckless indifference to human life and as a major participant."  (*Id.*, subd. (d).)

*Major participant*

The verdicts here were entered after *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522, 614-615 (*Clark*), which explained the requirements to impose death or LWOP on a participant in a felony murder who is not the actual killer.  The court "must examine the defendant's *personal* role in the crimes leading to the victim's death and weigh the defendant's individual

_____

[5] The prosecution did not seek the death penalty.

responsibility for the loss of life, not just his or her vicarious responsibility for the underlying crime." (*Banks,* supra, at p. 801, italics original.)

In *Banks*, the California Supreme Court identified several relevant factors to determine whether a defendant was a "major participant" in the underlying felony: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used? No one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Banks*, *supra*, 61 Cal.4th at p. 803, fn. omitted.)

White does not dispute that he was a major participant in the underlying felony. Indeed, White "was actively involved in every element" of the attempted robbery, including the planning, execution, and cover-up. (See, e.g., *Tison v. Arizona* (1987) 481 U.S. 137, 158 (*Tison*); *Medina, supra*, 245 Cal.App.4th at p. 792.) White helped plan the robbery, lured R.D. to his location for the robbery, armed himself with a BB gun that resembled an AK-47, and held it to R.D.'s head. White planned for Mohammed to use the loaded 9 mm gun that was usually kept near White's bed, and instructed Mohammed to remove the keys from R.D.'s ignition when he got into R.D.'s car to prevent R.D. from fleeing before the robbery was accomplished. Minutes after

9

the shooting, White telephoned K.M. for a ride, so the group could leave the crime scene. He changed his clothes, told G.O. to change his cell phone number, asked A.B. to say they had not been at the Bradley apartment, and attempted to sell the murder weapon. Substantial evidence thus established that White was a major participant in the robbery.

*Reckless Indifference*

Reckless indifference to human life requires that the defendant knowingly engaged in criminal activities that he *knew* involved "'"a *grave* risk of death."'" (*People v. Gonzalez* (2018) 5 Cal.5th 186, 203, italics original; *People v. Estrada* (1995) 11 Cal.4th 568, 577, citing *Tison, supra*, 481 U.S. at p. 157.) "The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Banks, supra*, 61 Cal.4th at p. 801.)

"Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, "'[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation."' [Citation.]" (*In re Scoggins* (2020) 9 Cal.5th 667, 677; *Clark, supra*, 63 Cal.4th at p. 617.)

*Clark* listed factors to consider in determining whether a participant acted with reckless indifference to human life: (1) knowledge that a gun will be used, defendant's own use of weapons, and the number of weapons; (2) the defendant's physical presence at the crime and opportunities to restrain the crime and/or aid the victim; (3) the duration of the felony; (4) the defendant's knowledge of a cohort's likelihood of killing; and (5) the defendant's efforts to minimize the risks of violence. (*Clark*, *supra*, 63 Cal.4th at pp. 618-623.)[6] Like the factors for "major participation," the above factors are neither necessary nor sufficient. (*Ibid.*) We look to the totality of the circumstances to determine whether White acted with reckless indifference to human life. (*Scoggins, supra*, 9 Cal.5th at p. 677.)

Notably, the requirements for being a major participant "significantly overlap" with the requirements for reckless indifference to human life, "for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life." (*Clark*, *supra*, 63 Cal.4th at p. 615, quoting *Tison, supra*, 481 U.S. at p. 153.)

In this context, two United States Supreme Court cases, *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*), and *Tison*, *supra*, 481 U.S. 137, form the basis of the concepts of

---

[6] The jury was instructed with a prior version of CALCRIM No. 703 which, at the time this case was tried in 2018, did not include the reckless indifference factors enunciated in *Clark*. The trial court has no sua sponte duty to instruct on the *Banks/Clarks* factors. (*People v. Nunez* (2020) 57 Cal.App.5th 78, 92.)

"reckless indifference" and "major participation" under section 190.2, subdivision (d). (*Banks*, *supra*, 61 Cal.4th at p. 794.)

As the California Supreme Court has observed, *Tison* and *Enmund* represent points on a continuum. (*Banks, supra*, 61 Cal.4th at p. 803.) At one end of the continuum is *Enmund*, in which the U.S. Supreme Court struck down the death penalty for a getaway driver who was waiting some distance away while his accomplices committed two murders during a robbery. At the other end of the continuum is *Tison*, where the death penalty was upheld for two brothers who helped plan and carry out the escape of two convicted murderers from prison. The Tison brothers brought weapons to the prison, armed the murderers, and held guards and visitors at gunpoint. Later, as part of the ongoing escape, the Tisons participated in robbing an innocent family on the road, holding them at gunpoint, and then standing by while the two prisoners shot and killed the family. "Somewhere between [these offenders], at conduct less egregious than the Tisons' but more culpable than Earl Enmund's, lies the constitutional minimum" for life without parole for non-killers. (*Banks*, *supra*, at p. 802.)

After reviewing the *Banks/Clarks* factors and considering the totality of the circumstances, we conclude that substantial evidence supports the jury's finding that White acted with reckless indifference to human life. White's conduct falls closer to the *Tison* side of the continuum, rather than the *Enmund* side. We discuss the factors:

*1. Knowledge, use, and number of weapons*

Although a defendant's awareness that a gun will be used in the felony is not enough by itself to establish reckless indifference to human life, "[a] defendant's *use* of a firearm, even

12

if the defendant does not kill the victim . . . can be significant to the analysis of reckless indifference to human life." (*Clark, supra*, 63 Cal.4th at pp. 617-618 & fn. 74.)  Here, White knew that Mohammed would be armed with a loaded 9 mm pistol. White had joint control over the pistol before and after the robbery.

White armed himself with a BB gun that resembled an AK-47 and held it up to the head of the intended victim.  "[A] BB gun is not an imitation gun," but "is an instrument designed to shoot by expelling a metal projectile at a target" and "is reasonably perceived as capable of inflicting serious injury."  (*In re Bartholomew D.* (2005) 131 Cal.App.4th 317, 326.) Additionally, the BB gun was a replica of an AK-47.  In our view, this would instill more fear than an ordinary "gun."  While the replica AK-47 could not kill, the victim did not know that.  It looked and felt real enough to provoke fear and a fair inference from the record is that looking down the barrel of what appeared to be an assault rifle is what prompted R.D. to step on the gas pedal.

White's use of the second apparent weapon in the robbery increased the risk the victims would believe their lives were in danger and they needed to take defensive action.  White points to no evidence that diminished his ability to appreciate the danger created by being an armed backup in the ill-fated attempt to rob a drug dealer.

*2. Physical presence at the crime and opportunities to restrain the crime and/or aid the victim.*

White was not simply a getaway driver.  Rather, he was actively involved in every element of the attempted robbery and physically present.  He played a role in planning and

executing the crime, used the replica AK-47 to point at R.D.'s head to intimidate him and prevent him from driving off, helped Mohammed escape, and showed no concern for the shooting victim. Once White observed there were two occupants in the car, he had an opportunity to suggest they abort the robbery based on the increased risk of violence (two men against Mohammed inside the car). Instead, White decided to go ahead with the robbery even though he should have known his armed presence would increase the risk of resistance by the victims out of fear they were going to be shot by two firearms.

White contends that after R.D. drove away, he was not in a position to restrain Mohammed from shooting Richardson or aid Richardson after the shooting. But this is not a mitigating factor. The only reason White was not present when Mohammed shot Richardson is because R.D. panicked and managed to move the car a very short distance away from White. White did not intend to separate himself from the robbery or reduce his involvement in it.

Moreover, White showed no remorse and made no effort to determine if anyone was injured in the shooting. (See *Medina, supra,* 245 Cal.App.4th at p. 793 ["He made no effort to determine if anyone was injured or to offer aid"]; *People v. Smith* (2005) 135 Cal.App.4th 914, 927-928, and cases cited therein [failure to aid victim or summon help shows reckless indifference to human life].)

3. *Duration of the Felony*

The evidence at trial showed that the duration of the robbery was short, probably only a few minutes. Contrary to White's contention, there is no evidence in the record that he and Mohammed planned to make this a quick robbery to reduce the

chance of violence. The robbery was quick because the victim panicked and tried to drive away. (See, e.g., *In re Parrish* (2020) 58 Cal.App.5th 539, 544 [brevity of the robbery and speed of murder due to witness calling police; "rapidity of this sequence does not make [the accomplice] less blameworthy".)

4. *White's knowledge of Mohammed's likelihood of killing*

There was no evidence that White knew Mohammed was likely to use violence or had a propensity to do so. However, the evidence shows that when Mohammed entered the car the slide on the gun had already been pulled and a bullet was in the chamber, readying the gun to be fired if necessary. White knew the 9 mm was loaded. The jury could have reasonably inferred that White knew Mohammed possessed a loaded, ready-to-fire handgun and that he would use it if the victims resisted.

5. *White's efforts to minimize the risks of violence during the felony.*

White took no steps to minimize the risk of violence at any point. Unlike the defendant in *Scoggins*, White knew the robbery plan involved firearms. (*Scoggins*, *supra*, 9 Cal.5th at p. 683.) Like the defendant in *Parrish, supra,* 58 Cal.App.5th at p. 544, White did not ensure the firearms were unloaded (the 9 mm pistol) or suggest to Mohammed that he reduce the risks. As explained below, White's use of the replica AK-47 was intended to keep R.D. from driving away and keep him and his passenger confined at gunpoint inside the car, which actually increased the risk of violence during the robbery.

Moreover, White's intent is established by his actions before, during, and after the robbery. A defendant's behavior after the murder may be relevant to whether he acted with reckless indifference to human life, although it is insufficient

15

standing alone.  (*In re Taylor* (2019) 34 Cal.App.5th 543, 560.)  In the hours after the shooting, White told G.O. to change his cell phone number because police would know he had called R.D., told A.B. to tell police they had not been home (at the Bradley apartment) on the night of the murder, and tried to sell the 9 mm murder weapon.  The next evening, he celebrated New Year's Eve by shooting off the handgun used to kill Richardson.  Nine days after the shooting, he discussed committing another armed robbery with a student, and stated he could bring a "banger," i.e., a gun.  These actions show he was unfazed by the shooting and show a willingness to engage in an armed robbery knowing it involved a grave risk of death.  (*Scoggins*, *supra*, 9 Cal.5th at p. 679 [defendant's actions after the shooting may also bear on the defendant's mental state]; *People v. Douglas* (2020) 56 Cal.App.5th 1, 11 [reckless indifference found where defendant committed a second armed robbery two days after the robbery murder; "the shooting did not prompt [defendant] to ensure nothing like that happened again"].)

*6.  Garden-variety armed robbery*

Our Supreme Court has referred to a "robbery in which the only factor supporting reckless indifference to human life is the fact of the use of a gun" as "'a garden-variety armed robbery'" that does not support a robbery-murder special circumstance for the non-killer.  (*Clark*, *supra*, 63 Cal.4th at p. 617, fn. 74.)  White claims it was a "garden-variety" armed robbery and should not qualify for LWOP.  We do not agree this was a "garden-variety" attempted robbery, such as those involving convenience stores or persons on the street where "'resistance, if any, would be slight, and armed resistance likely

16

nonexistent. . . .'" (*People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1090.)

This was "'the planned, armed robbery of a known drug dealer[,]'" as was the case in *Bascomb*. Here, appellants planned to rob a drug dealer at gunpoint inside a confined space, the dealer's compact car. The dealer's car contained two adult men, increasing the possibility that one or both of the men would resist. According to the plan, Mohammed got into the vehicle with a loaded gun while White used the threat of a second weapon outside the vehicle to prevent the car from leaving and keep the occupants confined while Mohammed effectuated the robbery. Holding the occupants at gunpoint in that confined space removed the possibility of escape for the victims, making it more likely they would resist instead of attempting to flee. Moreover, the display of a loaded gun in that small space increased exponentially the chances the victims would resist and the gun would discharge, either intentionally or otherwise, resulting in grave harm to the occupants.

Notwithstanding appellants' subjective belief that marijuana dealers are soft, that is not objectively reasonable. Drug dealers routinely arm themselves with guns and have an incentive to resist and protect their cash and product, which was illegal at the time, because they are unlikely to report a robbery to police. (See, e.g., *People v. Limon* (1993) 17 Cal.App.4th 524, 534 [drug dealers often armed]; *People v. Simpson* (1998) 65 Cal.App.4th 854, 862 [narcotics and guns are part and parcel of the drug trade]; *U.S. v. Salas* (9th Cir. 1989) 879 F.2d 530, 535 [not unreasonable to assume drug dealer may be armed and dangerous].)

A reversal for insufficient evidence as to reckless

indifference to human life is unwarranted unless it appears "'"'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict. . . .'" (*Manibusan, supra,* 58 Cal.4th at p. 87.)  Because here there are a variety of factors in the plan "that elevated the risk to human life beyond those risks inherent in any armed robbery," we conclude that substantial evidence establishes that White acted with reckless indifference to human life.  (*Clark, supra,* 63 Cal.4th. at p. 623.)  We affirm the special circumstance finding as to White.

### *Substantial Evidence of Mohammed's Identity*

Mohammed contends the evidence was insufficient to establish his identity as the killer.  We disagree.

R.D.'s identification of Mohammed is sufficient to support the jury's verdict.  He identified Mohammed in two photographic lineups.  Identification testimony of a single witness is sufficient to support a conviction where, as here, it is neither "physically impossible [nor] inherently improbable." (*People v. Young* (2005) 34 Cal.4th 1149, 1181 (*Young*).)

Mohammed contends he was denied due process because he was the only person whose photographs were in both lineups, and the identifications were impermissibly suggestive.  His failure to timely object to the evidence forfeited a challenge to its admissibility.  (Evid. Code, § 353, subd. (a); *People v. Cunningham* (2001) 25 Cal.4th 926, 989.)  Nor does the due process claim succeed on the merits.  "The fact that defendant was the only person common to both lineups did not per se violate his due process rights." (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1224.)

Mohammed also argues that R.D.'s identifications

were unreliable because he expressed uncertainty and had a limited ability to perceive the shooter.  These factors were resolved by "[t]he jury, as the sole judge of the credibility of witnesses . . . ."  (*Young, supra*, 34 Cal.4th at p. 1181.)

Moreover, R.D.'s eyewitness identification was corroborated by the testimony of G.O., and other witnesses who interacted with appellants after the shooting.  (See *People v. Jones* (2003) 30 Cal.4th 1084, 1112 [eyewitness testimony corroborated by accomplice testimony].)  Specifically, G.O. testified that while waiting for R.D. to arrive, White had the BB rifle and Mohammed had the handgun.  G.O. saw White outside the car pointing the rifle at the driver, and Mohammed in the back seat wrestling with the passenger.  The car drove away and G.O. heard gunshots.  Mohammed jumped out of the car and ran back toward the apartment.  Mohammed still had the gun and admitted he shot someone.

Because G.O. was an accomplice, his testimony required corroboration "by such other evidence as shall tend to connect the defendant with the commission of the offense." (§ 1111.)  """Corroborating evidence may be slight, entirely circumstantial, and entitled to little consideration when standing alone.  [Citations.] . . . It is 'sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.""  [Citation.]"  (*People v. Anderson* (2018) 5 Cal.5th 372, 411.)

R.D. corroborated G.O.'s testimony.  R.D. related the same series of events:  one man in the back seat with a pistol, another man standing at the window pointing an assault rifle, R.D. rapidly driving off, a shot, and the shooter jumping out of the car.  As noted, he corroborated not only the facts of the crime,

but the identification of Mohammed.  This was sufficient.

*Jury Instruction on Common Scheme or Plan*

Mohammed contends the trial court gave an improper pinpoint jury instruction regarding common scheme or plan.  We are not persuaded.

The trial court gave a modified version of CALCRIM No. 375, which stated:  "The People presented evidence in Counts 1, 2 and 3 that the defendants committed the crimes of Attempted Robbery and Robbery.  [¶] . . . [¶]  If you decide that the People have proved one or more of the crimes alleged in Counts 1 to 3, Attempted Robbery and Robbery, beyond a reasonable doubt, you may, but are not required to, consider that evidence for the limited purpose of deciding whether:  [¶]  A defendant had a common plan or scheme when he committed the offenses alleged in the other counts involving Attempted Robbery or Robbery.  [¶] . . . [¶]  In evaluating this evidence, consider the similarity or lack of similarity between the counts."

The instruction similarly stated that if the jury decided the People proved beyond a reasonable doubt one or more of the burglaries alleged in counts 4 through 7, it may consider that evidence to decide whether a defendant had a common plan or scheme to commit the other charged burglaries.

Mohammed expressed concern below about the jury relying solely on accomplice testimony, but he did not otherwise object to the instruction.  He stipulated that the court modify CALCRIM No. 375 by allowing consideration of the other charged acts if they were proven beyond a reasonable doubt rather than by a preponderance of the evidence.

Generally, failure to object to the wording of a jury instruction forfeits a claim of instructional error.  (*People v. Mora*

20

*and Rangel* (2018) 5 Cal.5th 442, 471.)  However, an appellate court may review a jury instruction, "even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."  (§ 1259.)   Here, we consider the instruction because it arguably affected the "'substantial rights of the defendant,'" but conclude the contention lacks merit.  (*People v. Carpenter* (1997) 15 Cal.4th 312, 380-381, abrogated on other grounds in *People v. Diaz* (2015) 60 Cal.4th 1176, 1191.)

The instruction permitted the jury to consider the other charged crimes as evidence of a common plan or scheme.  (Evid. Code, § 1101, subd. (b); *People v. Vargas* (2020) 9 Cal.5th 793, 817-818.)  We disagree with the claim that it was an improper pinpoint instruction.  It referred generally to the "presented evidence" of attempted robbery, robbery, or burglary in designated counts.  This designation was necessary for the jury to understand to which incidents the instruction applied.  The instruction did not direct the jury's attention to "specific items of evidence" or "'certain material facts.'"  (*People v. Wright* (1988) 45 Cal.3d 1126, 1135.)  Nor did the instruction "improperly imply the conclusion to be drawn from that evidence" (*People v. Harris* (1989) 47 Cal.3d 1047, 1098, fn. 31), i.e., that the other crimes necessarily involved the same persons.  Instead, the instruction stated, "If you conclude that a defendant committed the uncharged act, that conclusion is only one factor to consider along with all the other evidence."

*Jury Instructions on Accomplice Testimony*

White and Mohammed contend the trial court erred when it instructed the jury that accomplice testimony requires corroboration by only "slight" supporting evidence.  They are

incorrect.

In several instructions, with minor variations in wording, the trial court instructed the jury that it could not find defendants guilty of any crime or find true the special circumstance "based on the statement or testimony of an accomplice alone." Instead, accomplice testimony must be supported by "independent" "supporting evidence" that "tends to connect the defendant to the commission of the crimes." "Supporting evidence, however, may be slight. It does not need to be enough, by itself, to prove that the defendant is guilty of the charged crime, and it does not need to support every fact about which the witness testified. On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission." (CALCRIM Nos. 334, 335, 707, 708, modified.)

Appellants did not object to the accomplice jury instructions in the trial court. We nonetheless review the instructions because they arguably affected "substantial rights of the defendant." (§ 1259.)

The instructions properly describe the corroboration requirement of section 1111. The corroboration requirement does not "constitute[] an element of a criminal offense" and "has no bearing on the prosecution's proof of any element of the charged crime." (*People v. Frye* (1998) 18 Cal.4th 894, 968 (*Frye*), overruled on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22.) Instead, "[l]ike the provision making hearsay evidence inadmissible (Evid. Code, § 1200), section 1111 concerns the reliability of evidence that is used to convict an accused of a criminal offense." (*Frye, supra*, at p. 968.) Accordingly, the corroborative evidence may be slight and entitled to little

22

consideration when standing alone.  (*People v. Richardson* (2008) 43 Cal.4th 959, 1024.)

We do not agree with appellants' contention that *Frye, supra,* 18 Cal.4th 894, is undermined by *Carmell v. Texas* (2000) 529 U.S. 513.  There, the Supreme Court held that a new Texas law eliminating the requirement that a rape victim's testimony be corroborated did not apply to the trial of a crime committed before enactment of the law.  The ex post facto clause prohibited application of the new law because it was a "'law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.'"  (*Id.* at p. 522, italics omitted.)  No ex post facto issue is involved here.  *Carmell* did not hold that when corroboration is required by state law, it must be proven beyond a reasonable doubt.

Nor do we agree that the "slight evidence" requirement for corroboration is undermined by *Apprendi v. New Jersey* (2000) 530 U.S. 466, or *Ring v. Arizona* (2002) 536 U.S. 584.  Those cases hold that aggravating factors used to enhance a sentence must be proved to a jury beyond a reasonable doubt.  They do not involve the quantum of evidence necessary to corroborate an accomplice's testimony.

*Prosecutorial Misconduct*

White and Mohammed contend the prosecutor committed misconduct by vouching for the credibility of the prosecutor's charging decisions.  We disagree.

Several prosecution witnesses admitted making false statements to the police, despite agreements that they would not be prosecuted.  Detective Shawn Fuggs testified that if the prosecutor determined individuals were not truthful, "[t]hey

potentially could" be prosecuted for crimes "they had allegedly participated in."

Mohammed's attorney asked Detective Fuggs if "the proffer agreement allows [the prosecutor] to prosecute [G.O.] at the conclusion of this trial."  The prosecutor objected "because it depends what crimes you're talking about, what witnesses.  We don't just get to prosecute people . . . [W]e have to have a good-faith belief that we have enough evidence to convict beyond a reasonable doubt.  So there's a lot of considerations."

White's counsel objected to and moved to strike the prosecutor's statement.  In a sidebar discussion, counsel argued the prosecutor's statement was "very close to the edge of being a personal expression believing in the guilt of the defendants."  The prosecutor responded that she "wasn't really referring to these defendants."  Overruling the objection, the trial court stated, "It's clear to the jury that these folks signed a proffer agreement, they violated it, they were not prosecuted in response to that, and they could have been and they weren't."  The court instructed the prosecutor to "[a]sk as many questions as you want on the proffer agreement, just don't get into the Prosecutor's role."  White then withdrew the request to strike.  Mohammed did not object, move to strike, or seek an admonition.  At White's request, the court admonished the jury that the statements of attorneys are not evidence.

In closing argument, the prosecutor named witnesses who knew, or might have known, they were assisting criminal activity.  She stated, "But in order for those witnesses to have been prosecuted, we would have to be able to prove beyond a reasonable doubt that they knew when they assisted after the fact that the crime had actually occurred."  She told the jury,

24

"you're here to decide whether these two defendants are guilty beyond a reasonable doubt, not if the witnesses are guilty beyond a reasonable doubt." She added, "In a perfect world, all people that participated in a crime, we would charge them all, but the reality is that you have to have a case to put on."

In his closing argument, White argued that it "makes no sense" why only J.A. was charged with a felony. He argued that the police and the district attorney "were determined to convict the defendants at all cost" and "at the expense of giving passes to felons." Mohammed's closing argument stated that G.O. and M.T. lied so many times that they should have been prosecuted.

In rebuttal, the prosecutor said, "As far as pulling agreements and prosecuting people, the People can't just file charges, there has [*sic*] to be crimes that these people have committed beyond a reasonable doubt. We can give an immunity agreement to somebody . . ." Mohammed's objection to this comment was overruled.

The prosecutor discussed the roles of A.B. and K.M. She argued, "These are things that would have to be able to be proved beyond a reasonable doubt in order to file charges on them." She ended by stating that law enforcement and the prosecution only sought the truth in the case, "[a]nd the truth is that the defendants committed this crime."

After the prosecutor finished her rebuttal, Mohammed "put [his] objection on the record": the prosecutor's statements were "akin to a personal affirmation" that by prosecuting White and Mohammed, "she personally believes they are guilty beyond a reasonable doubt." The court responded, "Noted for the record."

25

"""[A] prosecutor is given wide latitude to vigorously argue his or her case'" [citation] and "'may make 'assurances regarding the apparent honesty or reliability of' a witness 'based on the "facts of [the] record and the inferences reasonably drawn therefrom."'" [Citation.] 'Improper vouching occurs when the prosecutor either (1) suggests that evidence not available to the jury supports the argument, or (2) invokes his or her personal prestige or depth of experience, or the prestige or reputation of the office, in support of the argument.'" (*People v. Rodriguez* (2020) 9 Cal.5th 474, 480 (*Rodriguez*).)

A prosecutor's improper comments constitute reversible error when they "'"infect the trial with such '"unfairness as to make the resulting conviction a denial of due process."'"'" (*People v. Rivera* (2019) 7 Cal.5th 306, 333.) "'"[T]he question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."'" (*Id.* at p. 334.) "We 'view the statements in the context of the argument as a whole.'" (*Rodriguez, supra,* 9 Cal.5th at p. 480.)

We presume the jury followed the judge's admonition regarding the prosecutor's statements during the testimony of Detective Fuggs. (*People v. Shazier* (2014) 60 Cal.4th 109, 150-151.) Neither appellant objected during the prosecutor's closing argument, and thereby failed to preserve the issue for appeal. (*People v. Price* (1991) 1 Cal.4th 324, 447.) Mohammed objected to the prosecutor's statements during rebuttal, but the failure of either counsel to request an admonition forfeited the claim. (*Ibid.*) "'The reason for this rule, of course, is that "the trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instructions the harmful effect upon

the minds of the jury.'" [Citation.]" (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1341.)

Nor did the prosecutor's statements constitute prejudicial misconduct.  The prosecutor did not state her personal belief as to appellants' guilt or suggest that their guilt was supported by information outside the record.  Instead, she said that witnesses who were given proffer agreements were not prosecuted because that would require proof beyond a reasonable doubt.  But it logically follows from her comments that because she was prosecuting White and Mohammed, she must have had "a good-faith belief that we have enough evidence to convict [them] beyond a reasonable doubt" and "[had] a case to put on."

It was improper for the prosecutor to tell the jury about the evidence needed to make a charging decision.  But the comments did not "infect the trial with . . . unfairness," and it is not reasonably likely the jury applied the remarks improperly. The prosecutor made it clear that it was the jury's role to decide if the charges were proven.  The acquittals and hung jury on all counts other than murder demonstrate that the jury did not simply defer to the prosecutor's evaluation of the evidence.

*People v. Alvarado* (2006) 141 Cal.App.4th 1577 does not mandate reversal.  There, the prosecutor said, "'I have a duty and I have taken an oath as a deputy District Attorney not to prosecute a case *if I have any doubt* that that crime occurred.  [¶]  The defendant charged is the person who did it.'" (*Id*. at p. 1580, italics added.)  The prosecutor there committed additional misconduct by referring to the defendant's uncharged possession of a crack pipe, and by claiming without support in the record that he "may have committed similar crimes against other 'little kids.' . . . " (*Id*. at p. 1586.)

27

The prosecutor's comments here were attenuated in that she referred to the charging of witnesses rather than appellants, said she needed only "a good-faith belief" there was enough evidence to convict, made clear the determination of guilt was the function of the jury, and did not refer to matters outside the record.  Any error was not prejudicial.

*Cruel and/or Unusual Punishment*

Appellants contend their LWOP sentences violate the cruel and/or unusual punishment provisions of the federal and state constitutions (U.S. Const., 8th Amend; Cal. Const., art. I, § 17).  Under controlling case law, their contentions are unavailing.

White was 22 years old at the time of the shooting, and Mohammed was 19 years old.  In briefs filed prior to sentencing, they argued an LWOP sentence was disproportionate to the crime given their young age and the fact the shooting was accidental, based on the jury's rejection of the allegation that Mohammed intentionally discharged a firearm in the commission of the robbery.  White added that he was not the shooter; Mohammed added that he had no prior criminal record and his childhood and background demonstrated a lack of maturity.  They both argued that but for the felony murder rule, an accidental shooting would be punished as involuntary manslaughter.  Both White and Mohammed invited the trial court to sentence them to the maximum punishment for involuntary manslaughter and robbery.

At sentencing, the trial court declined to reduce the statutory punishment.  The trial judge stated he was "convinced this was not an intentional killing, but that doesn't change the law.  It doesn't change the responsibility.  In the court's mind,

this [case] is not akin to [*People v. Dillon* (1983) 34 Cal.3d 441 [*Dillon*]].  It's not the exquisitely rare case where disproportionality is the issue."  We agree.

A sentence violates the state prohibition against "[c]ruel or unusual punishment" if "'it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.'"  (Cal. Const., art. I, § 17; *Dillon*, *supra*, 34 Cal.3d at p. 478; *In re Lynch* (1972) 8 Cal.3d 410, 424.)  A sentence violates the federal prohibition against "cruel and unusual punishments" if the sentence is "grossly disproportionate for a particular defendant's crime."  (U.S. Const., 8th Amend.; *Graham v. Florida* (2010) 560 U.S. 48, 60.)  "Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare."  (*Rummel v. Estelle* (1980) 445 U.S. 263, 272; see *People v. Abundio* (2013) 221 Cal.App.4th 1211, 1221 (*Abundio*).)

To determine if punishment is cruel or unusual, courts consider:  (1) the nature of the offense and the offender with regard to the degree of danger they present to society, (2) comparison with the punishment prescribed for more serious crimes in the jurisdiction, and (3) comparison with punishment for the same offense in other jurisdictions.  (*In re Lynch, supra,* 8 Cal.3d at pp. 425-427; *People v. Chacon* (1995) 37 Cal.App.4th 52, 63.)

Here, "[w]ith respect to 'the nature of the offense,' we recognize that when it is viewed in the abstract, robbery-murder presents a very high level of such danger, second only to deliberate and premeditated murder with malice aforethought."  (*Dillon*, *supra*, 34 Cal.3d at p. 479.)  Appellants' plan was to lure

the victim to their location late at night, threaten him with a handgun and a replica assault rifle, and rob him. The only comparison to other crimes in California offered by appellants are the accomplices here who did not participate in the actual robbery and were given proffer agreements. We decline to compare the punishment with other jurisdictions because the only input appellants offer on this point is the discussion of the death penalty in *Enmund, supra,* 458 U.S. at p. 792, and *Dillon, supra*, 34 Cal.3d at pp. 481-482. (*Dillon, supra*, at p. 487, fn. 38; *People v. Russell* (2010) 187 Cal.App.4th 981, 995.)

Although the trial court was "convinced this was not an intentional killing," appellants' culpability is distinguishable from the getaway driver in *Enmund*. Both Mohammed and White actively participated in the robbery; Mohammed was the actual killer and White held a replica AK-47 assault rifle to the head of the intended victim and used the threat of that weapon to keep the victims in a confined space to effectuate the robbery. In addition, the sentence stricken in *Enmund* was death, not LWOP.

Nor are appellants comparable to the defendant in *Dillon*. Dillon was an intellectually and emotionally immature 17-year-old high school student who "functioned 'like a much younger child'" and lived "in a world of make-believe." (*Dillon, supra*, 34 Cal.3d at p. 483.) Although a guard with a shotgun had twice ejected Dillon from the victim's farm, Dillon planned to reenter the farm, hit the victim over the head, tie him to a tree, and harvest the growing marijuana. (*Id.* at p. 451.) Here, unlike the "immature, nonlethal grandiosity" of Dillon's plan, appellants' "plan was simple and straightforward." (*Abundio, supra,* 221 Cal.App.4th at p. 1220.) And appellants were adults, attending community college and living on their own. Although

Mohammed experienced difficulties in his childhood and upbringing, "nothing in the record suggests that he manifested the unusual immaturity shown by Dillon." (*Id.* at p. 1219.)

The sentences imposed on appellants were not cruel or unusual.[7]

*Ability to pay fines and fees*

The trial court ordered White and Mohammed to each pay $4,393.86 in restitution to the restitution fund (§1202.4, subd. (f)), a $10,000 restitution fine (§ 1202.4, subd. (b)), a court security fee of $40 (§ 1465.8), and a criminal conviction assessment of $30 (Gov. Code, § 70373).

White and Mohammed contend the trial court erred when it imposed these fines and fees without conducting an ability-to-pay hearing. (*People v. Dueñas* (2019) 30 Cal.App.5th 1157.)

The minimum restitution fine in a felony case is $300 and the maximum is $10,000. (§ 1202.4, subd. (b)(1).) "The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense." (*Ibid.*) "Inability to pay may be considered . . . in increasing the amount of the restitution fine in excess of the minimum fine." (§ 1202.4, subd. (c).) Despite the opportunity to object to the restitution fine, neither White nor Mohammed objected at sentencing. Consequently, they forfeited this claim. And because they did not object to the $10,000 restitution fine, they also forfeited

---

[7] Appellants' arguments are better addressed to the legislature or the governor. We note that Senate Bill No. 300 (2020-2021 Reg. Sess.), an act to amend section 190.2 of, and to add section 1170.97 to, and to repeal section 1385.1 of, the Penal Code, was recently introduced in the California Legislature.

challenges to the much smaller $40 court security fee and $30 criminal conviction assessment, the amounts of which are set by statute. (See *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033; *People v. Torres* (2019) 39 Cal.App.5th 849, 860 [same; failure to object to imposition of fines and fees]; *People v. Avila* (2009) 46 Cal.4th 680, 729 [forfeiture; failure to object to restitution fine].)

Appellants' due process arguments were also forfeited and may not be raised for the first time on appeal. (See *People v. Trujillo* (2015) 60 Cal.4th 850, 859 [constitutional rights not implicated when counsel failed to object to imposition of probation-related fees].)

On the merits, appellants make no showing that the fines are grossly disproportionate to the gravity of the offenses (*United States v. Bajakajian* (1998) 524 U.S. 321, 339-340), or that appellants lack the ability to pay the fines and fees with prison wages. (*People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837 [ability to pay includes defendant's ability to obtain prison wages].)

DISPOSITION

The judgments are affirmed.

NOT TO BE PUBLISHED.


YEGAN, J.


I concur:


GILBERT, P. J.

32

TANGEMAN, J., Concurring and Dissenting:

Although I join in the disposition as to appellant Mohammed, I respectfully dissent as to appellant White. As to him, the majority write that "[t]he key phrase in this appeal is 'reckless indifference to human life.'" (Maj. opn, *ante*, at p. 1.) I agree. But another key phrase to consider is "garden-variety armed robbery."

Appellants were 19 and 22 years old at the time this robbery was committed. They hatched a plan to rob sellers of marijuana at gunpoint because those sellers were unlikely to resist (or report) the crimes; because they were "soft" victims, "easy to take advantage of." But the robbery went awry, and in a struggle the gun discharged, resulting in what the trial court described as "not an intentional killing." Appellants are now serving the harshest sentence possible short of the death penalty—life without parole.

Because Mohammed was the actual killer, no relief is available to him. But White stands in a different position as a coparticipant who was not present when the fatal shot was fired.

White was clearly a major participant. (*People v. Banks* (2015) 61 Cal.4th 788 (*Banks*).) But I disagree that the evidence establishes that he acted "with reckless indifference to human life" based on the factors set forth in *People v. Clark* (2016) 63 Cal.4th 522, 618-623 (*Clark*). And I find it most troubling that we will never know if the jury so found: the jury was instructed with a prior version of CALCRIM No. 703 that did not include the reckless indifference factors laid out in *Clark* (which was decided two years earlier). Had they been instructed as to the *Clark* factors, a different conclusion might have been reached.

1

Our Supreme Court has referred to a "robbery in which the only factor supporting reckless indifference to human life is the fact of the use of a gun" as "'a garden-variety armed robbery'" that does not support a robbery-murder special circumstance for the non-killer. (*Clark*, *supra*, 63 Cal.4th at p. 617, fn. 74; *Banks*, *supra*, 61 Cal.4th at p. 802.) Because here "there appears to be nothing in the plan that one can point to that elevated the risk to human life beyond those risks inherent in any armed robbery," I conclude that substantial evidence does not establish that White acted with reckless indifference to human life. (*Clark*, at p. 623.)

The majority compare the facts of this crime with those involved in *Enmund v. Florida* (1982) 458 U.S. 782 and *Tison v. Arizona* (1987) 481 U.S. 137, cases which present facts at opposite ends of a continuum. They conclude that "White's conduct falls closer to the *Tison* side of the continuum, rather than the *Enmund* side" (maj. opn., *ante*, at p. 12). I reach the opposite conclusion, based on application of the *Clark* factors:

*1. Knowledge, use, and number of weapons*

Two weapons were used; one lethal and one non-lethal. White was aware that the lethal weapon would be used by Mohammed. But as the majority acknowledge, that is also the case in any "garden-variety armed robbery" and thus "not enough by itself to establish reckless indifference to human life" (maj. opn., *ante*, at p. 12). This factor is therefore neutral.

*2. Physical presence at the crime and opportunities to restrain the crime and/or the aid the victim*

It is true that White could have withdrawn from the scene when he observed two occupants in the car. But that is also true

whenever multiple victims are robbed, and no cases have been cited holding that a "garden-variety armed robbery" occurs only when a single victim is involved.  (See *In re Miller* (2017) 14 Cal.App.5th 960 [no reckless indifference to human life where defendant's associate approached female robbery victim and her male companion; after associate took the woman's purse, companion "unexpectedly confronted" associate, who shot and killed him].)  And after R.D. drove away (immediately before the shooting), White was not able to restrain Mohammed from shooting *or* determine if anyone was injured and offer aid.  This factor militates against a finding of reckless indifference.

3.  *Duration of the felony*

"[T]he duration of the robbery was short, probably only a few minutes" (maj. opn., *ante*, at p. 14).  The evidence establishes that this was always the plan—that Mohammed would slide into the rear seat, take money and the goods, and then exit the vehicle.  This factor militates against a finding of reckless indifference.

4.  *White's knowledge of Mohammed's likelihood of killing*

"There was no evidence that White knew Mohammed was likely to use violence or had a propensity to do so" (maj. opn., *ante*, at p. 15).  There was no evidence that they discussed the use of violence, or that Mohammed had committed violent acts in the past that White was aware of.  Nor was there any evidence that White knew the slide of the gun had already been pulled. The majority's conclusion that the "jury could have reasonably inferred that White knew Mohammed possessed a loaded, ready-to-fire handgun and that he would use it if the victims resisted" (maj. opn., *ante*, at p. 15) is entirely speculative and finds no support in the record.  The only basis for this speculation is that

3

White knew Mohammed possessed a gun; a fact common to every "garden-variety armed robbery."  And because the jury was never instructed that this factor should even be considered, no basis exists for an implied finding by the jury on this issue.  This factor does not support the finding of reckless indifference.

5. *White's efforts to minimize the risks of violence during the felony*

White and Mohammed agreed to rob sellers of marijuana precisely because armed resistance was unlikely.  These targets were "just sweet, soft" and "easy."  Although the jury did not find that they committed the other charged robberies, those incidents did not involve violence.  As in *Banks*, there was no evidence that White "intended to kill or . . . knowingly conspired with accomplices known to have killed before." (*Banks*, *supra*, at p. 807.)  And like the accomplice in *Banks*, "nothing in the record reflects" that White "knew there would be a likelihood of resistance and the need to meet that resistance with lethal force" (*id*. at p. 811).  In short, "there appears to be nothing in the plan that one can point to that elevated the risk to human life beyond those risks inherent in any armed robbery." (*Clark*, *supra*, 63 Cal.4th at p. 623.)

In concluding otherwise, the majority rely heavily on *People v. Bascomb* (2020) 55 Cal.App.5th 1077.  A cursory reading of *Bascomb* demonstrates why it offers no support:  There, the two defendants planned and executed a home invasion robbery into a residence occupied by four individuals, where they pushed their way into the home, forced one of the victims to the ground at gunpoint, and where both parties were present and actively participating at the time the fatal shot was fired.  In contrast here, there was no invasion into an occupied residence, White did

4

not use a lethal weapon, and White was not present at the time of the shooting, so was not in a position to restrain Mohammed or aid the victim.

For these reasons, I would reverse the special circumstances finding as to White and remand for resentencing.

<u>NOT TO BE PUBLISHED.</u>

TANGEMAN, J.

James Voysey, Judge

Superior Court County of Santa Barbara

_____

Mark R. Feeser, under appointment by the Court of Appeal, for Defendant and Appellant Lavell Calvin White.

Thomas T. Ono, under appointment by the Court of Appeal, for Defendant and Appellant Ali Abdul Mohammed.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul M. Roadarmel, Jr. and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.