Filed 1/26/22  P. v. Jacot CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JANICE DIANE JACOT,<br><br>    Defendant and Appellant. | B307199<br><br>(Los Angeles County<br>Super. Ct. No. KA028882) |

APPEAL from an order of the Superior Court of Los Angeles County, Mike Camacho, Judge.  Reversed and remanded with directions.

Jonathan E. Demson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kristen J. Inberg and Stephanie C. Santoro, Deputy Attorneys General, for Plaintiff and Respondent.

Janice Diane Jacot appeals the denial of her petition for resentencing on her second degree murder conviction, contending that she did not act with reckless indifference to human life when she organized and supplied the weapons used in an armed robbery that turned deadly.  Under controlling California law we are compelled to agree.  We therefore reverse the trial court's order and remand for resentencing.

### FACTS AND PROCEDURAL HISTORY[1]

### 1.    Facts Surrounding the Crimes

In October 1996, Jacot pled no contest to second degree murder, robbery, two counts of attempted robbery, and attempted carjacking.  She was sentenced to a total of 17 years, six months to life as follows: 15 years to life for the murder, plus one year for a firearm enhancement, along with a collective 18 months on the remaining counts.

On the night of August 22, 1995, 16-year-old Jacot and another teenaged female accepted a ride from three men they met as the latter were leaving a nightclub.  The three men – the eventual victims – took Jacot and her friend back to Jacot's apartment and waited outside for the two girls as they dropped off some items.  Inside Jacot's apartment was Daniel McKeehan, a gang member also known as "Puppet," who had been staying with Jacot.

Jacot knew that Puppet "made his money[ ] by robbing people and stealing cars."  She told Puppet that she and her friend were going out with three men who "had a lot of money

---

[1] Jacot was convicted after a no contest plea.  As a result, our statement of facts is based on the plea form, the reporter's transcript and minute order from the hearing where the plea was taken, and the transcript of the preliminary hearing.

and jewelry and that he could rob them when they came back." She told Puppet to wait for them in front of the apartment complex, then opened a safe where Puppet kept two handguns, gave him the weapons, and said, "When we leave, you come out and rob them."

Jacot and her friend left with the victims, and the group drove around and bought and used cocaine before returning to Jacot's apartment. Jacot told the victims she and her friend would come back with marijuana and then told them to park near the front gate of the apartment complex. Jacot and her friend then walked into the complex. From her apartment, Jacot saw Puppet walk toward the victims' car. According to one of the victims, Puppet approached the car, pointed two handguns at them, and demanded their cash, car keys, and "everything that [they] had." Puppet then pistol-whipped passenger Miguel Mestas and grabbed Mestas's wallet. The driver-victim began to drive away, prompting Puppet to fire one round – the fatal shot that struck Mestas in the back of the head.

Jacot heard the gunshot and saw Puppet run back into the complex through a side alley; he returned to the apartment within minutes. Puppet changed his clothes and gave Jacot the guns, which she put back in the safe. Puppet told her he had shot one of the victims in the head and gave her the wallet and other stolen items to dispose of.

Puppet then left. Jacot put the handguns and Puppet's other belongings in a duffel bag and hid his clothes in her closet. Jacot's mother later disposed of the duffel bag.

After disclosing the above during her police interrogation, Jacot "broke down crying." She told the officer that Puppet "was

3

just supposed to rob them, not kill them, and that the only thing she had asked for was $5 for cigarettes."

## 2.    Resentencing Petition and Hearing

In February 2019 Jacot filed a petition seeking resentencing on her murder conviction (Pen. Code, § 1170.95)[2], contending that she did not act with reckless indifference to human life, as required by changes in the law that occurred long after her conviction.[3]  The trial court found that Jacot stated a prima facie case and issued an order to show cause why Jacot was not entitled to be resentenced.

At the show cause hearing, a court-appointed psychological expert testified that Jacot had intellectual deficits that adversely affected her memory, nonverbal skills, and ability to make and execute sound decisions.  Additionally, Jacot suffered from sexual abuse and drug use during her childhood.  The expert opined that the combination of these factors and the general effects of youth on the brain's ability to evaluate information and make proper decisions likely rendered Jacot unable to reflect ahead on the consequences of her actions at the time of the crimes.  No further new or additional evidence was introduced.

Relying on *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) and *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), Jacot argued that the evidence showed she did not act with reckless indifference to human life because: the guns belonged to Puppet; there was no evidence she knew they were loaded; despite her knowledge of Puppet's criminal activities, there was no evidence she knew he had ever committed violence; she was not present

---

[2] All further section references are to the Penal Code.

[3] We discuss these changes in some detail below.

4

during the robbery and therefore had no opportunity to intervene and either stop Puppet or render aid to Mestas; the robbery took place very quickly, meaning there was less time for the crime to "go south"; the evidence showed she did not intend that anyone be killed; and she was only 16 years old at the time, and therefore lacked an adult's ability to "make the appropriate judgments" of risk.

The prosecution argued that Jacot had been a major participant in the robbery, a point Jacot largely conceded. It further argued that she acted with reckless indifference to human life, because she planned the crimes, supplied Puppet with multiple firearms despite her knowledge of his criminal history, and failed to intervene to stop the crime or aid Mestas.

The trial court found that Jacot's intellectual functioning and cognitive development had been severely impaired around the time of the robbery. It also found that there was no evidence that she acted with express malice or otherwise intended to kill. However, the court found that Jacot was a major participant who acted with reckless indifference to human life. The trial court relied on the following factors: (1) Jacot was part of, and was present at, the planning and implementation phases of the robbery, and was near the crime scene when Puppet shot Mestas; (2) despite her knowledge that Puppet had committed robberies in the past, Jacot supplied him with two handguns, increasing the likelihood of lethal violence and showing awareness of what was needed for one robber to confront multiple victims; (3) she knew lethal violence had occurred once she heard the gunshot, but did nothing to assist the victims and instead helped Puppet hide evidence; (4) the crime was of long duration given the level of planning involved to set up and execute the robbery; and (5)

5

Jacot did nothing to minimize the risk of violence, instead increasing the risk through her actions.[4]

## DISCUSSION

**1. Senate Bill 1437 and Section 1170.95**

Senate Bill No. 1437 (Stats. 2018, ch. 1015; SB 1437) eliminated natural and probable consequences liability for aiders and abettors of murder and restricted the scope of the felony murder rule by amending sections 188, subdivision (a)(3) and 189, subdivision (e).[5] (*People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*)). Section 188, subdivision (a)(3) now prohibits the imputation of malice to a person who has merely participated in a crime, while section 189, subdivision (e) allows felony murder liability only when a person "was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e)(3).)

SB 1437 also added section 1170.95, creating a procedure for those previously convicted under one of the now-barred theories to file a petition seeking resentencing. (*Lewis*, *supra*, 11 Cal.5th at p. 957.) A facially adequate petition entitles a petitioner to the appointment of counsel and a response from the prosecution. (§ 1170.95, subds. (b)(1), (c); *Lewis*, *supra*, 11

---

[4] The trial court's ultimate ruling was largely consistent with its detailed tentative ruling.

[5] Senate Bill No. 775 (Stats. 2021, ch. 551), effective January 1, 2022, "[c]larifies that persons who were convicted of attempted murder or manslaughter under a theory of felony murder and the natural and probable consequences doctrine are permitted the same relief as those persons convicted of murder under the same theories."

Cal.5th at p. 970.) The trial court then holds a hearing to determine if the petitioner made a prima facie case for relief. (§ 1170.95, subd. (c).) If so, the court must issue an order to show cause why relief should not be granted. (*Ibid.*; *Lewis*, *supra*, 11 Cal.5th at p. 971.)

At the show cause hearing, the prosecution must prove beyond a reasonable doubt that the petitioner is guilty of murder, attempted murder, or manslaughter under amended sections 188 and 189. (§ 1170.95, subd. (d)(3).) Both the prosecution and the petitioner are permitted to "offer new or additional evidence." (*Ibid.*) The trial court acts as an independent factfinder and determines whether the prosecution has met its burden. (*People v. Ramirez* (2021) 71 Cal.App.5th 970, 984 (*Ramirez*).)

We review the trial court's factual findings under the substantial evidence standard. (*Ramirez*, *supra*, 71 Cal.App.5th at p. 985.) We view the record in the light most favorable to the judgment and determine whether it contains substantial evidence from which a reasonable trier of fact could find the petitioner guilty beyond a reasonable doubt. (*Ibid.*)

## 2. Major Participation and Reckless Indifference

The United States Supreme Court has twice considered the degree of conduct and mental state required to impose the death penalty on non-killers convicted of felony murder. These two cases, *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*) and *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*) "collectively place conduct on a spectrum, with felony-murder participants eligible for death only when their involvement is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions." (*Banks*, *supra*, 61 Cal.4th at p. 794.)

7

*Enmund* lies at one end of the spectrum; although defendant Enmund located a robbery victim, drove armed confederates to the victim's house, acted as a getaway driver, and helped dispose of the weapons, the Court found him ineligible for the death penalty because he did "'not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed.'" *(Banks*, *supra.* 61 Cal.4th at p. 799, quoting *Enmund*, *supra*, 458 U.S. at p. 797.) In *Tison,* the Supreme Court considered whether the death penalty could be imposed on two brothers who broke their father and his cellmate out of prison using numerous weapons and then, in their ensuing escape, carjacked and robbed a family that their cohorts ultimately killed. (See *Tison, supra*, 481 U.S. at pp. 138-142.) It held that the brothers could constitutionally be subject to the death penalty because their "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." (*Id.* at p. 158.)

The language of the *Tison* holding was directly incorporated into section 190.2, subdivision (d) (*ibid.*), which governs special circumstance murder but was itself incorporated into section 189, subdivision (e)(3) by SB 1437. Accordingly, "the standard under section 189, subdivision (e)(3) for holding . . . a defendant [who was not the actual killer] liable for felony murder is the same as the standard for finding a special circumstance under section 190.2(d), as the former provision expressly incorporates the latter." (*In re Taylor* (2019) 34 Cal.App.5th 543, 561 (*Taylor*).) Death penalty cases interpreting section 190.2, subdivision (d), including *Banks*, *supra*, 61 Cal.4th 788 and *Clark*, *supra*, 63 Cal.4th 522, thus remain controlling here.

The California Supreme Court has clarified that *Enmund* and *Tison* "establish that a defendant's personal involvement [in the crimes] must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder such as Earl Enmund." (*Banks*, *supra*, 61 Cal.4th at p. 802.) That is, he or she must have acted as a "major participant" in the crime, under the totality of the circumstances. (*Id.* at p. 803.) Factors relevant to the major participant inquiry include: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks, supra,* 61 Cal.4th at p. 803.) "No one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.'" (*Ibid.*) Moreover, "the greater the defendant's participation in the felony murder, the more likely that he [or she] acted with reckless indifference to human life." (*Tison, supra,* 481 U.S. at p. 153.)

To determine whether a defendant acted with reckless indifference to human life, "*Tison,* and in turn section 190.2(d), look to whether a defendant has "'knowingly engag[ed] in criminal activities known to carry a grave risk of death.'"

9

[Citations.]" (*Banks*, *supra*, 61 Cal.4th at p. 801.) "The defendant must be aware of and willingly involved in the violent manner in which a particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Ibid.*) Although "there are some felonies as to which one could properly conclude that any major participant necessarily exhibits reckless indifference to the value of human life," such as "'the manufacture and planting of a live bomb,'" armed robbery is not among them. (*Clark*, *supra*, 63 Cal.4th at p. 615, quoting *Banks*, *supra*, 61 Cal.4th at p. 810, fn. 9.)

In *Clark*, *supra*, 63 Cal.4th at pp. 618-622, the court enumerated a five-factor test to determine whether a defendant acted with reckless indifference to human life, clarifying that no one factor is necessary, nor is any sufficient by itself. The first factor is the defendant's knowledge of weapons, and use and number of weapons. (*Id.* at p. 618.) The court clarified that "[t]he mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life." (*Ibid.*) However, it may be "significant" if a defendant brings an "'arsenal of lethal weapons'" to the crime scene or personally uses a weapon during the crime. (*Ibid.*) The second factor is whether the defendant was physically present at the crime scene and whether he or she had opportunities to restrain the crime or aid the victim(s). (*Id.* at p. 619.) A defendant's presence may be particularly significant where "the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force." (*Ibid.*) The third factor

is the duration of the felony; crimes of longer duration present greater risk of violence and therefore evince more reckless indifference. (*Id.* at p. 620.) The fourth factor is the defendant's knowledge of his or her coparticipants' likelihood of killing. (*Id.* at p. 621.) A defendant who knows a coparticipant has previously used lethal force is more culpable than one unaware of a coparticipant's propensity for violence. (*Ibid.*) The fifth factor is whether the defendant made any efforts to minimize the risk of violence during the felony. (*Ibid.*) Such efforts may include planning the felony to occur at a time or location where bystanders are unlikely to be present, or using unloaded or minimally loaded firearms. (See *id.* at pp. 621-622.)

Both the "magnitude of the objective risk of lethal violence and a defendant's subjective awareness of that risk" are relevant to the reckless indifference inquiry. (*Clark*, *supra*, 63 Cal.4th at p. 623.) "Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient" to demonstrate reckless indifference to human life. Instead, "knowingly creating a 'grave risk of death'" is necessary to establish the requisite mindset. (*Banks*, *supra*, 61 Cal.4th at p. 808.) As is particularly relevant here, "'the fact a participant [or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference to human life." (*In re Scoggins* (2020) 9 Cal.5th 667, 677 *(Scoggins),* quoting *Banks*, *supra*, 61 Cal.4th at p. 808 [alteration in original].) "The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed," and must then consciously disregard "the significant risk of death his or her actions create." (*Banks*, *supra*, 61 Cal.4th at p. 801.)

11

A defendant's youth is also a relevant factor in determining whether he or she acted with reckless indifference to human life. (*Ramirez*, *supra*, 71 Cal.App.5th at p. 987, citing *In re Moore* (2021) 68 Cal.App.5th 434, 454 (*Moore*).)  This is because children generally lack the experience, perspective, and judgment of adults, and are also generally less responsible and mature. (*Moore*, *supra*, at p. 453.)  Further, children tend to act more immaturely or impetuously than adults and may fail to appreciate the risks and consequences of their actions.  (*Id*. at p. 454.)

## 3.   Analysis

The trial court relied heavily on the fact that Jacot provided handguns to Puppet, a known robber, as proof that she acted with reckless indifference to human life.  We agree with Jacot that the trial court erred.

Jacot's knowledge that Puppet would be armed does not equate to knowledge that he was likely to actually use a gun to shoot any of the robbery victims.  (See *Clark*, *supra*, 63 Cal.4th at p. 618; *Banks*, *supra*, 61 Cal.4th at p. 809 ["felony murderers . . . who simply had awareness their confederates were armed and armed robberies carr[y] a risk of death, lack the requisite reckless indifference to human life"]; *id*. at p. 809, fn. 9 [disapproving *People v. Lopez* (2011) 198 Cal.App.4th 1106 "to the extent it holds the knowledge one's accomplice is armed can, by itself, establish reckless indifference to human life under section 190.2(d)"].)  Even where the defendant supplies guns and it can be inferred that he or she knew the guns were loaded and operable, as in *In re Ramirez* (2019) 32 Cal.App.5th 384, 404, more is required to show that the defendant acted with reckless indifference to human life.

12

That "more" is typically the defendant's knowledge that his or her cohort is likely to use the guns in a lethal manner.[6] *In re Loza* (2017) 10 Cal.App.5th 38 is illustrative. There, the petitioner gave the shooter a gun right before the planned robbery occurred. (*In re Loza, supra*, 10 Cal.App.5th at p. 53.) The court found that to be "a significant factor indicating petitioner's reckless indifference" because the shooter had told petitioner moments before that he had recently shot someone in the head, putting the petitioner "on notice of the increased likelihood of [the shooter's] willingness to use the gun." (*Ibid.*)

The court found that Jacot was on similar notice here, but neither the case law nor the record supports the court's finding. Our appellate courts have generally "refused to attribute significance to prior criminal activity that did not involve *deadly* violence." (*Taylor, supra*, 34 Cal.App.5th at p. 558 [emphasis in original].) In *Taylor*, for instance, the court found that the petitioner's knowledge that the shooter was involved in "various illegal activity, including drug sales," was not sufficient to show he was aware the shooter had engaged in previous violent behavior. (*Ibid.*) As the court stated in *Clark, supra*, 63 Cal.4th at p. 621 (emphasis added), "[a] defendant's willingness to engage in an armed robbery with individuals *known to him [or her] to use lethal force* may give rise to the inference that the defendant

---

[6] Respondent contends that Jacot showed reckless indifference by giving Puppet two guns to rob the three victims, a point the court relied on. We fail to see any significant difference between providing one or two guns, and respondent does not support its contention with any citation to authority. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793 [briefs should contain legal with citation to authorities; if no authority is furnished on a particular point, the court may treat it as waived].)

disregarded a 'grave risk of death.'" Even though the record here showed that Jacot knew Puppet had committed previous robberies, there was no evidence she knew he had ever used lethal force.

Respondent contends that a propensity for violence may be inferred because Puppet "was a known gang member who committed robberies in the past." A shooter's gang membership does not demonstrate a propensity to commit lethal violence. (See *Banks*, *supra*, 61 Cal.4th at pp. 810-811.) Here, there was no evidence that Puppet previously participated in any crimes that would put Jacot on notice that the victims' lives would be in particularly grave danger during the "garden-variety armed robbery" the two planned together. (*Clark*, *supra*, 63 Cal.4th at p. 617 fn. 74.)

The trial court also emphasized Jacot's significant role in planning and setting up the crimes. This factor is most relevant to whether a person was a major participant, but the two inquiries "significantly overlap . . ., for the greater the defendant's participation in the felony murder, the more likely that he [or she] acted with reckless indifference to human life." (*Tison*, *supra*, 481 U.S. at p. 153.)

Jacot undoubtedly played a major role in setting up the crimes: she suggested robbing the victims, gave Puppet the guns, and brought the victims back to the apartment complex where he was waiting for them. Even viewing this evidence in the light most favorable to the court's ruling, "there appears to be nothing in the plan that one can point to that elevated the risk to human life beyond those risks inherent in any armed robbery." (*Clark*, *supra*, 63 Cal.4th at p. 623.)

14

Indeed, Jacot's involvement in planning was similar to that of Enmund, who located the victim and drove his armed cohorts to the victim's house (see *Enmund*, *supra*, 458 U.S. at pp. 784-787; see also *id.* at pp. 803-804 (dis. opn. of O'Connor, J.)), and less intensive than that of Clark, who spent at least a month planning and setting up an armed robbery of a computer store. (See *Clark*, *supra*, 63 Cal.4th at pp. 536-538.)  Neither of those defendants was found to have acted with reckless indifference to human life despite their significant planning roles.

The trial court also found the crime was of lengthy duration:  "it did take some time to do the robbery beyond the actual physical act of attempting to take the property."  This finding, while supported by the evidence, does not comport with our supreme court's interpretation of a crime's duration as the "period of interaction between perpetrators and victims."  (*Clark*, *supra*, 63 Cal.4th at p. 620.)  Even where the defendant spent more than a month planning the robbery of a store and intended to lock store employees in a bathroom while the crime was being committed, the court found "the evidence was insufficient to show that the duration of the felony under these circumstances supported the conclusion that defendant exhibited reckless indifference to human life."  (*Id.* at pp. 620-621.)  Here, the planning phase lasted minutes, the luring of the victims took an hour, and the robbery itself took minutes at most.

The trial court also found that Jacot was "present during the planning stage and up to and near the actual scene of the crime when the gunshot was fired," had an unspecified opportunity to stop the killing, and failed to render assistance to the victims after the gunshot was fired.  Jacot asserts and the Attorney General agrees that she was "not in the immediate

presence of the victims during the robbery." It is thus unclear how Jacot could have learned that Puppet had escalated the conflict, intervened to prevent him from using lethal force, or aided the victims. Absence from the crime scene is not suggestive of reckless indifference. (See, e.g., *Taylor*, *supra*, 34 Cal.App.5th at p. 559 ["Taylor's physical position during the crime also weighs in his favor. Although Taylor was parked on the street near where the killing occurred, he never got out of the car and had no opportunity to prevent the shooting. Indeed, it appears that Taylor could not even see Davis's interaction with Cary. Rather, Taylor's primary role was to be the getaway driver. . . ."]; *Ramirez*, *supra*, 71 Cal.App.5th at p. 989 ["Although Ramirez was present at the scene, at the time of the shooting, he and Gallardo were on the passenger side of the car, and Ramirez would not have had a meaningful opportunity to intervene when Rios—on the driver's side of the vehicle—'[went] crazy' and began to shoot."]; *In re Ramirez*, *supra*, 32 Cal.App.5th at p. 405 ["the evidence shows petitioner was in close proximity to the shooting, but it does not show he was close enough to exercise a restraining effect on the crime or his colleagues"].)

Jacot's age at the time of the crimes further diminishes any inference that she acted with reckless indifference for human life. Her expert testified that children have underdeveloped executive functioning skills, and it is now well recognized that a juvenile's "immaturity and failure to appreciate the risks and consequences of his or her actions" affect his or her subjective awareness of the risk his or her actions create. (*Ramirez*, *supra*, 71 Cal.App.5th at p. 789.) The evidence does not support the inference that Jacot, a 16-year-old who wanted $5 for cigarettes, appreciated the potential risks inherent in the armed robbery she set in motion,

16

let alone the elevated risk necessary to establish reckless indifference.  (See *Scoggins, supra*, 9 Cal.5th at p. 682.)

In re Moore, supra, 68 Cal.App.5th 434, is analogous. There, 16-year-old Moore and two coparticipants stole a car and drove around a mall parking lot looking for a robbery victim. While Moore remained in the car, one of the coparticipants robbed a man at gunpoint and then shot him twice in the chest without provocation.  (*In re Moore, supra*, 68 Cal.App.5th at p. 440.)  The court held that even if the *Clark* factors "support a finding of reckless indifference for an adult. . . those factors undoubtedly preclude such a finding when viewed from the lens of Moore's youth."  (*Id.* at p. 454.)  Jacot's age and actions correspond to those of Moore.  And, as in *In re Moore*, the totality of the circumstances, including Jacot's youth, does not support the trial court's findings here.[7]

The cases relied on by respondent do not persuade us otherwise.

In *People v. Lopez, supra*, 198 Cal.App.4th at page 1117, the adult defendant lured a robbery victim into a secluded alley and failed to render aid after her cohort shot the victim. However, *Banks* disapproved *Lopez* "to the extent it holds the knowledge one's accomplice is armed can, by itself, establish reckless indifference to human life," and did "not resolve whether *Lopez* was correctly decided based on [the] other evidence." (*Banks, supra*, 61 Cal.4th at p. 809, fn. 8.)  In *People v. Medina* (2016) 245 Cal.App.4th 778, 792-793, the adult defendant was

---

[7] Because we conclude the court erred based on its application of the standard *Clark* factors and Jacot's youth, we need not address Jacot's arguments concerning her psychological and intellectual functioning.

armed with and used a gun, participated in the actual robbery, knew of his cohorts' propensities for violence, and made no attempt to stop the violence or aid the victims despite his presence. In *People v. Smith* (2005) 135 Cal.App.4th 914, overruled on another ground as recognized in *People v. Garcia* (2008) 168 Cal.App.4th 261, 291, the court found the adult defendant acted with reckless indifference despite acting as a lookout because the robbery lasted "many tumultuous minutes" during which the victim was stabbed 27 times, beaten with a steam iron, and had her head smashed through the wall where the defendant was standing sentry.

None of these cases is factually analogous to this one. We recognize that Jacot bears a large share of the responsibility for the tragic events that unfolded here. She planned and facilitated an armed robbery and provided the eventual murder weapon to the actual perpetrator. However, the current state of the law in this area, combined with Jacot's age at the time, her absence from the scene, and the absence of any evidence that she knew or should have known that Puppet had ever shot or otherwise harmed any of his previous crime victims, compels us to reverse the trial court's order.

## DISPOSITION

The order denying Jacot's petition for resentencing under section 1170.95 is reversed. The matter is remanded with directions to enter a new order granting the petition, vacating Jacot's murder conviction, and resentencing her on the remaining charges in accordance with section 1170.95, subdivision (d)(3).

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MICON, J. [*]

WILLHITE, ACTING P.J.

CURREY, J.

---

[*] Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.